COWEN, Circuit Judge:
Presented in this appeal is the question of liability for fraud and related allegations under the Commodities Exchange Act, 7 U.S.C. §§ 1 et seq., (the “CEA” or “Act”) 'and accompanying regulations. Plaintiff/Appellant Commodities Futures Trading Commission (“CFTC”) appeals from a judgment finding all Defendants not liable under the Act for various solicitation and trading activities carried out at R.J. Fitzgerald & Company, Inc. (“RJFCO”). After reviewing the record in this matter, considering the submissions of the parties, and having benefitted from oral argument, we conclude that the District Court erred in not finding liability under the Act as a matter of law for two specific solicitation devices utilized by RJFCO: (1) a television commercial that aired on the “CNBC” cable network in March 1998 (The “Commercial”) and (2) a promotional seminar for potential RJFCO customers that also took place in 1998 (the “Seminar”). For the reasons expressed below, we will reverse as to Raymond Fitzgerald, Leiza Fitzgerald and RJFCO, and remand only for enforcement proceedings against those two individuals and the firm.
*1324 I. Procedural .Background
In 1999, CFTC commenced this CEA enforcement case by filing a Complaint against Defendants/Appellees RJFCO, Raymond Fitzgerald, Leiza Fitzgerald, Chuck Kowlaski, and Greg Burnett, alleging that they were involved in fraudulent solicitations to attract potential customers throughout the United States to invest in commodity options, in violation of the Act and related federal regulations.[1] This Complaint was dismissed essentially for failure to plead fraud with particularity.
The District Court then required CFTC to file an Amended Complaint detailing every fact it intended to prove in establishing liability under the ACT. CFTC complied with that request, filing ah extensive 138 page, 15 count Complaint which sets the framework for the instant case. The Amended Complaint alleged that Defendants, or some individual Defendants, violated the Act by: (1) committing fraud by misrepresentation or omission of material facts in connection with the solicitation, maintenance, or execution of commodity futures transactions; (2) operating an introducing brokerage firm to cheat, defraud, deceive, or attempt to cheat, defraud or deceive clients; (3) trading client accounts excessively in order to generate commissions without regard to customer interests (“churning”); (4) failing to provide risk disclosure statements prior to the opening of RJFCO customer accounts; and (5) failing to supervise firm personnel diligently. Defendant Raymond Fitzgerald was charged with “controlling person” liability under the Act. The various allegations in the Amended Complaint encompass claims grounded in 7 U.S.C. § 6c(b), 17 C.F.R. § 33.10(a) and (c), 17 C.F.R. § 166.3, and 7 U.S.C. § 13c(b).
Counts one, two, seven and nine alleged that Raymond Fitzgerald, as principal of RJFCO, RJFCO, Leiza Fitzgerald and Greg Burnett committed fraud by misrepresentation or omission of material facts in connection with the solicitation of commodity futures transactions. Counts three, ten and fifteen charged Raymond Fitzgerald, as principal of RJFCO, RJFCO, Greg Burnett and Chuck Kowalski with operating an introducing brokerage to cheat, defraud, deceive, or attempt to cheat, defraud or deceive clients. Counts four and eleven charged Raymond Fitzgerald, RJFCO, and Greg Burnett with committing fnaud by trading client accounts excessively to generate commissions without regard to client interests. Count five charged Raymond Fitzgerald and RJFCO with failing to provide adequate risk disclosure statements prior to opening customer accounts. Counts six, eight, and twelve charged Raymond Fitzgerald, Leiza Fitzgerald and Greg Burnett with failing to supervise diligently the sales practices and solicitations of RJFCO brokers.
After some of the claims in the Amended Complaint were dismissed on summary judgment, the parties agreed, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, to conduct a bench trial before a Magistrate Judge.[2] That trial commenced on February 26, 2001. On March 8, 2001, the Court heard oral argument and granted what it labeled a “directed verdict” against a significant part of the CFTC’s case. Ger-maine to this appeal, and as will be ex *1325 plained further below, the District Court granted relief to Defendants on that part of the CFTC’s claim that the Commercial violated the Act as well as on the claim that Defendants had a duty to disclose their specific trading record (i.e., their success rate) to potential customers.
The trial pressed forward to completion on the remaining claims in the Amended Complaint and concluded on March 19, 2001. Thereafter, the District Court entered extensive findings of fact and conclusions of law, ruling in favor of all Defendants on all counts in the Amended Complaint. See CFTC v. R.J. Fitzgerald & Co., Inc., 173 F.Supp.2d 1295 (M.D.Fla.2001). CFTC appeals, essentially arguing that regardless of the Court’s factual findings based on witness credibility, Defendants committed fraud and other CEA violations as a matter of law.
II. Background Facts
A. The Defendants
RJFCO was a full service “introducing broker” at all times relevant to this appeal. See 7 U.S.C. § la. RJFCO’s obligations to those with whom it dealt were guaranteed by Iowa Grain Company (“Iowa Grain”), a registered futures commission merchant. RJFCO opened for business in 1992. It operated as a firm designed to service small customer accounts, where the customer base had little experience in commodities markets. RJFCO operated in a perhaps unique manner in the commodities industry in that it used one team of sales brokers for generating customers via telephone calls and a separate team of brokers and traders to do the actual trades and monitor accounts. Defendant Raymond Fitzgerald was the principal of RJFCO and was responsible for all decisions, actions, and trading recommendations made or entered into by the firm. Defendant Leiza Fitzgerald’s responsibilities at RJFCO involved developing training materials and training sales brokers. Greg Burnett was an associated person at RJFCO and was responsible for supervising traders and brokers. Chuck Kowalski was RJFCO’s chief financial analyst, responsible for studying the commodities markets and developing trades and trade strategies.
B. Customer Solicitation Devices
At the heart of this appeal are two solicitation devices used by RJFCO to attract customers to invest in options on futures contracts: the Commercial and the Seminar.
1. The Commercial
The Commercial stated that “the El Nino [weather phenomenon] has struck where expected, and if patterns continue, the effects could be devastating. Droughts, floods, and other adverse conditions could drastically alter the supply and demand dynamics of the corn market....” The Commercial also declared that “[w]ith the giant developing nations, such as China and Russia badly in need of grains and world grain supplies put to the test, conditions may exist for profits as high as 200 to 300 percent.” This was accompanied by a graphic statement on the television screen that the percentages were a mathematical example of leverage. The Commercial further asserted that “the potential of the corn market may never be greater. Tight U.S. reserves coupled with domestic and worldwide demands could be the formula for a trade you won’t want to miss. Find out how as little as $5,000 could translate into profits as high as 200 to 300 percent. Call R.J. Fitzgerald today.... ”
*1326 The Commercial was initially drafted by an advertising agency. When Raymond Fitzgerald first received the script, he edited it to add additional risk disclosures that would appear just above the firm’s phone number, so that anyone watching the Commercial would see the risk disclosure. He further insisted that this disclosure appear more than half the time the Commercial was running. After his edits were done, he sent the script to Iowa Grain’s chief compliance officer, Anne Far-ris. Iowa Grain approved the script on February 18,1998.
The Commercial actually ran on CNBC for the first half of March, 1998, but did not generate much business. In total, it appeared about eight or nine times and was then discontinued. At some point after its discontinuation, Raymond Fitzgerald was contacted by a National Futures Association (“NFA”)[3] compliance officer, who expressed concern over the Commercial’s content. More specifically, the NFA officer, David Croom, informed Raymond Fitzgerald that the Commercial was in apparent violation of NFA rules because: (1) it was misleading in that it failed to tell potential customers that the options spoken of were “out-of-the money options” that would require a dramatic move in the options premium value in order for the customer to see gains equal to that claimed in the Commercial; (2) misleadingly gave the impression that weather events were inevitable; (3) did not display the risk of loss statement prominently enough on the screen; and (4) downplayed the risk of loss. In response to this concern, Raymond Fitzgerald informed Croom that the Commercial had already been discontinued and would not be aired again.
At the close of CFTC’s case, and before the defense was presented, the District Court entered a directed verdict in favor of Defendants on the part of the claim that the Commercial was fraudulent and violated the CEA. The District Court addressed the Commercial again in its opinion issued after the bench trial, stating that the Commercial was not “misleading or deceptive” and that there was no “intent to defraud.” 173 F.Supp.2d at 1310.
2. RJFCO’s 1998 Promotional Seminar
In addition to the Commercial, CFTC alleged CEA violations occurred in a promotional seminar used by RJFCO to attract customers. The Seminar was developed by Leiza Fitzgerald and RJFCO brokers Scott Campbell and Tom West after they attended a training session on the topic conducted by the National Introducing Brokers Association.[4]
The Seminar informed customers that weather patterns, political events, and historical trends can affect the prices of certain commodities. The Seminar also told *1327 customers that technical analysis could assist them in the commodity options market, since “history often repeats itself’ and “past price action can provide you with clues to future action.” Customers were told they could “take advantage” of “fundamental” market moves such as weather events and political events and “technical theory” such as past market movements through either futures or options investing. The Seminar also drew a distinction between investment instruments based on the quantum of risk involved:
Which one you choose depends on how aggressive or what degree of risk you wish to take on.
If you are highly aggressive and looking for unlimited profit potential as well as unlimited risk than [sic] it would be the futures. But most would like something less aggressive, something offering unlimited profit potential but limited risk— option trade [sic].
On the topic of risk, the Seminar additionally told potential customers: “options on futures allow investors and risk managers to define risk and limit it to the loss of a premium paid for the right to buy or sell a futures contract while still providing ... unlimited profit potential.”
The RJFCO employees who conducted the Seminar offered what the Seminar script deemed a “very exciting” illustration of how profits could be made on options. Specifically, the Seminar focused on the commodity heating oil, explaining that for the last eighteen years, there was an average increase in that commodity “of 22 cents from the low to the high in the price range” and that a $5,000 investment on a heating oil futures contract would result in $46,200 if there was a 22 cent move in the price. Customers were told that if they wanted “limited risk,” they could invest in an option contract, where they would receive “approximately 50% of that profit— 46,200 divided by 2 equals $23,100.”[5]
In its opinion following the bench trial, the District Court concluded that the Seminar did not violate the CEA. The District Court explained that there was nothing “patently or latently misleading or deceitful” about the profit illustrations used in the seminar. 173 F.Supp.2d at 1311.
III. Discussion
The District Court had jurisdiction over this case under 7 U.S.C. § 13a-l and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 636(c)(3) and 28 U.S.C. § 1291.
It is somewhat unclear from the briefing what specific parts of the judgment below are being challenged by CFTC, especially given the large number of allegations in the extremely lengthy Amended Complaint. CFTC’s initial brief requests that this Court “reverse the district court’s judgment and remand with instructions to enter judgment in favor of appellant CFTC on the Amended Complaint” Appellant’s Brief at 57. However, we can construe the CFTC’s appellate position from the briefing and from oral argument. It specifically challenges these discrete aspects of the District Court’s judgment: (1) the Commercial did not violate the Act; (2) the Seminar did not violate the Act; (3) Defendants had no duty to disclose their trading record to potential customers; (4) *1328 Defendants did not excessively trade their customers’ accounts without regard to customer interest; and (5) Raymond Fitzgerald did not have “controlling person” liability under the Act. As explained below, we agree that the District Court erred in not finding liability as a matter of law under the Act for the Commercial, the Seminar, and for failure to disclose RJFCO’s trading record in both. We further agree that Raymond Fitzgerald is liable in this case as a “controlling person” at the firm. We do not disturb the District Court’s judgment as to the remaining alleged points of error.
A. The Commercial
CFTC argues that the District Court erred because the Commercial is fraudulent as a matter of law. Upon review of the full text of the Commercial, we are constrained to agree. The CEA and its accompanying regulations directly proscribe attempts to deceive and defraud in connection with futures and options trading. 17 C.F.R. § 33.10 provides:
It shall be unlawful for any person directly or indirectly:
(a) To cheat or defraud or attempt to cheat or defraud any other person;
(c) To deceive or attempt to deceive any other person by any means whatsoever
in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.
See also 7 U'.S.C. § 6b(a)(i), (iii) (proscribing similar conduct in connection with a futures contract).
In order to establish liability for fraud, CFTC had the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. See Hammond v. Smith Barney Harris Upham & Co., [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,617 (CFTC Mar. 1, 1990); CFTC v. Trinity Finan. Group, Inc., Comm Fut. L. Rep. 27,179, 1997 WL 820970 (S.D.Fla. Sept. 29, 1997), aff'd in relevant part, CFTC v. Sidoti, 178 F.3d 1132 (11th Cir.1999). Failure to establish any one of these elements is dispositive and would preclude CFTC’s fraud/deception claims.[6]
Whether a misrepresentation has been made depends on the “overall message” and the “common understanding of the information conveyed.” Hammond, Comm. Fut. L. Rep. at 36,657 & n. 12. For purposes of fraud or deceit in an enforcement action, scienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant’s conduct represents an extreme departure from the standards of ordinary care. See, e.g., Messer v. E.F. Hutton & Co., 847 F.2d 673, 677-79 (11th Cir.1988). In the similar context of federal securities law, we have previously stated that scienter is met when Defendant’s conduct involves “highly unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it.” Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir.2001). A representation or omission is “material” if a reasonable investor would consider it important in deciding *1329 whether to make an investment. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); R&W Technical Servs., Ltd. v. CFTC, 205 F.3d 165, 169 (5th Cir.2000).
In applying these various elements to the present ease, we are guided by the principle that the CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor— who may know little about the intricacies and complexities of the commodities market — from being misled or deceived. As the Fifth Circuit recently explained in R&W:
In 1974, Congress gave the [CFTC] even greater enforcement powers, in part because of the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities markets through fraudulent advertising. Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not lessened.
Id. at 173 (citations omitted) (emphasis added).
The parties obviously do not contest the textual content of the Commercial. The actual words of the Commercial and how the Commercial physically appeared on television are undisputed matters of record and do not require us to second guess what the District Court concluded with regard to witness demeanor and credibility at the bench trial. That being said, we are persuaded that these undisputed facts demonstrate fraud and deception as a matter of law.
Read for its overall message, and how that message would be interpreted by an objectively reasonable television viewer, the Commercial overemphasizes profit potential and downplays risk of loss, presenting an unbalanced image of the two. The Commercial suggests to the potential investor, that truly enormous profits (200-300%) can be made on options on futures contracts by looking at known and expected weather patterns. More specifically, the Commercial affirmatively represents to potential RJFCO customers that El Nino had struck “where expected” and that if the “patterns continue,” “huge profits” of “200 to 800%” could be realized. The Commercial also improperly overstated the profit potential by suggesting to potential customers that they should not pass up such a tremendous chance to make money. Rather, viewers are told to call RJFCO “now” because there may “never” be such an opportunity in the corn market again. (“The potential of the corn market may never be greater [and] ‘could be the formula for a trade you won’t want to miss.’ Find out how as little as $5,000 could translate into profits as high as 200 to 300 percent. Call R.J. Fitzgerald today.”). Against these highly alluring statements is only boilerplate risk disclosure language. We agree with CFTC’s position that these statements directly contravene the legal principles established in prior commodities fraud cases. See, e.g., Trinity Finan. Group, Comm. Fut. L. Rep. 27,179, aff'd in relevant part, Sidoti, 178 F.3d 1132; In re JCC, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,080 (CFTC May 12, 1994), aff'd, JCC, Inc. v. CFTC, 63 F.3d 1557 (11th Cir.1995); Bishop v. First Investors Group, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) 27,004, 44,841 (CFTC Mar. 26, 1997); In re Staryk, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. 27,206, 45,809, 1997 WL 840840 (CFTC Dec. 18, 1997). As we have *1330 indicated in various prior commodities cases, the fact that the Commercial had a general risk disclosure statement does not automatically preclude liability under the CEA where the overall message is clearly and objectively misleading or deceptive. See Clayton Brokerage Co. v. CFTC, 794 F.2d 573, 580-81 (11th Cir.1986); JCC, 63, F.3d at 1565 n. 23, 1569-70; Sidoti, 178 F.3d at 1136 (“we seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial.”); see also Bishop, Comm Fut. L. Rep. at 44,841. Contrary to Defendants’ argument, we see no absolute, bright-line requirement in these cases that a solicitation offer a “clear guarantee[]” of profits before liability is triggered. Appellees’ Brief at 40. "Nor should there be. Such an exacting standard would thrust the door of deception wide open, allowing clearly misleading statements to escape CFTC enforcement, thereby thwarting the underlying purpose of the Act. Brokers would have free reign to abuse their knowledge by subtly manipulating customer beliefs about the functioning of commodities markets, afforded safe haven so long as no actual “guarantee” is made. .
Having determined that the Commercial contained deceptive and misleading statements, we next consider the element of scienter. This element is also met here as a matter of law: Defendant acted recklessly with regard to the statements aired on television. This recklessness is premised on the fact that this Court and the CFTC have previously condemned attempts to attract customers by: (1) linking profit expectations on commodities options to known and expected weather events, seasonal trends, and'historical highs; (2) suggesting that the commodities market can be correctly timed to generate large profits; and (3) substantially inflating option profit expectations while downplaying risk of loss. We hold that Defendant, as a federally registered professional, knowledgeable in the nuances and complexities of the industry, deviated in an extreme manner from the standards of ordinary care.
The final element, materiality, is satisfied as well. It is too obvious for debate that a reasonable listener’s choice-making process would be substantially affected by emphatic statements on profit potential (“200-300%”) and the suggestion that known and expected weather events are the vehicle for achieving those enormous profits. A reasonable investor would also be heavily influenced by the suggestion in the Commercial that, due to weather events, the present day offers an opportunity like no other to make money in the corn market. See In re JCC, Comm. Fut. L. Rep. at 41,576 n. 23 (“When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers.”). See also CFTC v. Noble Wealth Data, 90 F.Supp.2d 676, 686 (D.Md.2000) (representations about profit potential and risk “go to the heart of a customer’s investment decision and are therefore material as a matter of law”), aff'd in part and vacated in part, 278 F.3d 319 (4th Cir.2000).
Defendants argue that scienter is lacking with regard to the Commercial because Raymond Fitzgerald edited the Commercial to include more disclosures, sought and received approval from Iowa Grain, and assured NFA official Croom that the Commercial had already been discontinued after Croom expressed concern over its misleading content. None of these *1331 arguments can overcome the CFTC’s position that prior cases establish the illegality of the Commercial’s content as a matter of law. Moreover, Defendants should not be able to escape liability under the Act by simply claiming that a related private business entity (Iowa Grain) issued its stamp of approval. Iowa Grain does not determine with legal finality what constitutes deceptive solicitations under the CEA and its regulations.
Defendants further argue that CFTC has not established “clear error” in the District Court’s finding that the Commercial was not “deceptive or misleading,” asserting that CFTC cannot possibly leap the barrier of this highly deferential standard of review. We are not persuaded. It is too well-settled for dispute that findings of fact which flow directly from the observation of witnesses at trial cannot be reversed unless clearly erroneous. But that doctrine of appellate review is not implicated here. This is not a situation where we must defer to a trial court’s conclusion of fact because that conclusion rests on the unique opportunity to personally scrutinize live testimony at trial and measure credibility word by word. Rather, the precise language in the Commercial is an undisputed part of the appellate record. The fraudulent and deceptive nature of that language is, as CFTC posits, established as a matter of law in precedent. The precise error at the district court level is definitively legal in nature: it is the failure to recognize that the outcome of CFTC’s claim on the uncontested words in the Commercial is controlled by case law. See generally Lincoln v. Board of Regents, 697 F.2d 928, 939 (11th Cir.1983) (if legal error taints fact finding process, de novo review may be used by appellate court).[7]
B. The Promotional Seminar
Much of the discussion above on the illegality of the Commercial applies to the Seminar as well. We hold that the Seminar is also fraudulent and deceptive as a matter of law. Like the Commercial, the Seminar, when viewed in its entirety, suggests to a reasonable listener that RJFCO has a reliable strategy in place for increasing profits and limiting losses.[8] Like the Commercial, it presents a distinctly unbalanced picture between the potential for profit and the potential for loss in options, inflating one while downplaying the other. The Seminar also impermissibly suggests that profits on options on futures contracts (the specific type of investment they were promoting) are proportionally related to the cash market. See CFTC v. Commonwealth Finan. *1332 Group, Inc., 874 F.Supp. 1345, 1352 (S.D.Fla.1994), vacated on other grounds, 79 F.3d 1159 (11th Cir.1996); Bishop, Comm. Fut. L. Rep. at 44,841 (deceptive to tell customer that one could earn $420 for every penny increase in heating oil); In re JCC, Comm. Fut. L. Rep. 26,080 (fraud to tell customer that every time sugar moves ten cents, you make $67,000); Trinity Fi-nan. Group, Comm. Fut. L: Rep. 27,179 (deceptive to use cash prices to predict proportional profits on heating oil options).
Furthermore, as with the Commercial, the Seminar, in its heating oil mathematical illustration, misleads potential customers by suggesting that historical movements and known and expected seasonal patterns can be used reliably to predict profits on options. The Seminar gave those in attendance a deceptive impression that known seasonal trends will lead to their quick success and that options provide a scenario of “limited risk.” In this regard, we are especially concerned with the Seminar’s suggestion toward the end of the undisputed script that “greed” is a major reason people do not make money in commodities and that a customer “will never go broke taking a profit.” Despite the Seminar’s use of risk disclosure material, the overall impression is that RJFCO is going to make customers money if they invest in options. Such conduct simply cannot survive under the Act, its underlying purpose, its regulations, and the interpretive case law. As with the Commercial, the statements in the Seminar are clearly material because an objectively reasonable investor’s decision-making process would be substantially affected by the Seminar’s discussion on limited risk, cyclical heating oil-weather patterns, and examples and illustrations of large profits. Such representations, as a matter of law, alter the total mix of relevant information available to the potential commodity option investor. Scienter is also established on this record as a matter of law for the same reasons as with the Commercial. Precedent has condemned materially similar representations in the past, including specific representations on heating oil. We hold that Defendants acted with the requisite recklessness and departed in an extreme manner from the ordinary standards of care.
C. Fraudulent Omission: Nortr-Disclo-sure of the Film’s Success Record
As explained above, CFTC contends, and we agree, that liability is established with regard to the language used in the Commercial and the Seminar. As an additional violation of the Act, CFTC claims that these two solicitation devices were fraudulent as a matter of law because they spoke of RJFCO’s strategy for enormous profit potential without simultaneously informing potential RJFCO customers that more than 95% of the firm’s clientele lost money in the types of investments being advertised.[9] We agree.
Given the extremely rosy picture for profit potential painted in the Seminar and in the Commercial, a reasonable investor surely would want to know — before committing money to a broker — that 95% or more of RJFCO investors lost money. Such a disclosure would have gone a long way in balancing out, for example, the affirmative representation in the Commercial that the grain market was ripe for “huge” profits of “200-300 percent” and to *1333 telephone RJFCO “now5’ because such a corn market opportunity may “never” exist again. It would also have done much to counteract the assertion of “limited risk” in the Seminar. It is misleading and deceptive to speak of “limited risk” and “200-300” percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money. See Ziemba, 256 F.3d at 1206 (duty to disclose arises where a “defendant’s failure to speak would render the defendant’s own prior speech misleading or deceptive”) (emphasis in original); Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir.1986) (same); see also Modlin v. Cane, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) 28,059, 49,550, 2000 WL 33678421 (CFTC March 15, 2000) (“a reasonable investor who hires a broker ... would clearly find it material to learn that that broker had never closed an account with a profit.”); W. Page Keeton et al., Prosser and Keeton on Torts § 106 at 738 (5th ed. 1984) (“half of the truth may obviously amount to a lie, if it is understood to be the whole.”).[10]
In its determination that there was no duty to disclose, the District Court was influenced by the fact that there was no evidence that other firms in the commodities industry did any worse than RJFCO and that RJFCO did not affirmatively represent that it had an attractive success rate. Given the highly misleading nature of the Commercial and Seminar-, we fail to discern the legal significance of those facts in this case. As CFTC has persuasively arg-ued, the Act should not foster a “race to the bottom,” where liability for unquestionably deceptive activity is based in part on whether your competitors are not doing any better than you are. The focus of the inquiry is not on how well or how poorly others firms have done or even, in some circumstances, whether a firm has affirmatively boasted about a particular win-loss record. Rather, the judicial cross hairs in this case fall squarely on what the investor would reasonably want to know before deciding to commit money to a broker. See, e.g., 17 C.F.R. § 33.7(f); Sidoti 178 F.3d at 1136 n. 3 (explaining that § 33.7(f) “bolsters” 17 C.F.R. § 33.10 by stating that standard risk disclosures do not relieve a broker from the obligation of disclosing all material facts to potential or existing options customers). This of course brings us back, as it should, to the underlying remedial purpose of the Act: protecting the individual investor from being misled or deceived in the highly risky arena of commodities investment. The omission of highly material information is pernicious because it strikes at the very core of individual autonomy. The law vigorously protects the right of private individuals to exercise free choice in the marketplace. Such freedom of choice is eviscerated, and the autonomy of the individual severely undermined, if decision-altering information is withheld.
D. Excessive Trading of Customer Accounts
CFTC argues that the district court erred by finding that Defendants did not excessively trade client accounts without regard to client interest, in contravention of the Act. We do not agree. This “churning” claim stems from a specific trading strategy developed by Defendant Kowalski *1334 in 1998 known as “synthetic futures.” The details of that strategy were sufficiently explained in the District Court, see 173 F.Supp.2d at 1306-1309, and do not warrant repetition here. In order to succeed on a churning claim, CFTC had to establish that Defendants intentionally or recklessly traded client accounts in excess, without regard to client interest, and that Defendants controlled the accounts in question. See, e.g., Patch v. Concorde Trading Group, Inc., [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,253, 42,125 (CFTC Oct. 31, 1994). Unlike the Commercial and the Seminar, the churning claim is intimately connected with factual conclusions derived from witness testimony and credibility assessments made at the bench trial. For example, the requisite element of control over customer accounts in this case is an inquiry that turns upon the credit given to witnesses by the trier of fact. We have reviewed the District Court’s analysis of this claim and cannot find that entering judgment in favor of Defendants on this claim was erroneous.
E. “Controlling Person” Liability under the Act
CFTC asserts that the District Court erred by finding Raymond Fitzgerald not liable as a “controlling person” under the provisions of 7 U.S.C. § 13c(b). We agree. “A fundamental purpose of Section 13b is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself.” JCC, 63 F.3d at 1567 (internal quotations and citation omitted). In order to succeed on a 13c(b) claim, CFTC must show that Defendant, as a controlling person, did not act in good faith or knowingly induced, directly or indirectly, the conduct which constitutes a violation of the Act. To satisfy the latter standard, CFTC must show that the controlling person had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue. Id. at 1568. Section 13c(b), therefore, is about power, and imposing liability for those who fail to exercise it to prevent illegal conduct.
Applying this legal standard to the record, we conclude that Raymond Fitzgerald meets the criteria for 13c(b) liability. First, we note that Raymond Fitzgerald openly concedes that he was a “controlling person” at RJFCO. Appellees’ Brief at 62. Raymond Fitzgerald was RJFCO’s principal and exercised the ultimate choice-making power within the firm regarding its business decisions. See 173 F.Supp.2d at 1297. He reviewed and approved the activities that we hold today violated the Act and its regulations-the Seminar and the Commercial. He was ultimately responsible for compliance with all applicable rules on commodities solicitations. He had the power and the authority to prevent the Seminar from being conducted, or to alter its content to comply with extant law.
IV. Conclusion
This case serves as a pungent reminder that caveat emptor has no place in the realm of federal commodities fraud. Congress, the CFTC, and the Judiciary have determined that customers must be zealously protected from deceptive statements by brokers who deal in these highly complex and inherently risky financial instruments. Upon review of the record and controlling law, we conclude that the District Court erred in finding that the Commercial and the Seminar did not violate *1335 the CEA and its regulations. Both were deceptive and misleading, unquestionably material to the potential customer, and promulgated with the requisite scienter. These two solicitation devices also violate the Act because they failed to disclose extremely material information that any reasonable investor would want to know before committing money.
Raymond Fitzgerald is liable for the Commercial and Seminar under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. Leiza Fitzgerald is liable for her involvement with the Seminar under § 6c(b) and § 33.10. For purposes of this CEA violation by Leiza Fitzgerald, Raymond Fitzgerald is a controlling person and is liable under § 13c(b). RJFCO is liable for the individual violations of Raymond Fitzgerald and Leiza Fitzgerald pursuant to 7 U.S.C. § 2(a)(1)(B). As to all other Defendants, we will affirm the order of the District Court. We remand the matter for enforcement proceedings on the above violations by Raymond Fitzgerald, Leiza Fitzgerald and RJFC. To the extent that we did not discuss other points of error raised by CFTC or by Defendants, we deem them without merit. Each party to bear its own costs.

. The Complaint also named as a Defendant RJFCO employee Al Coringrato who settled the claim before trial.

. Trial before the Magistrate Judge will hereafter be referred to as the “District Court” or the “Court.”

. The National Futures Association (“NFA”) is a congressionally authorized futures industry self regulatory organization. The purpose of the NFA is to assure high standards of business conduct by its Members and to protect the public interest.

. Leiza Fitzgerald developed the script of this Seminar based in part on materials from an NFA workbook and manuals from the Chicago Board of Trade. Testimony adduced at the bench trial revealed that RJFCO employees would read the promotional scripts given to them by Leiza Fitzgerald verbatim. The Seminar provided general background on the firm and how the commodities market operates. At the beginning of the Seminar, participants received written risk disclosure material. As with the Commercial, the content of the Seminar was approved by Iowa Grain before it went into action.

. Finally, the Seminar had more general advice for potential RJFCO customers: a "big reason" people lose money is "greed” and that "you will never go broke taking a profit, just take it one piece at a time.”

. Unlike a cause of action for fraud under the common law of Torts, "reliance" on -the representations is not a requisite element in an enforcement action. See, e.g., CFTC v. Rosenberg, 85 F.Supp.2d 424, 446 (D.N.J.2000).

. As part of their argument that the Commercial is not deceptive, Defendants assert that investors had, in the past, actually made profits as large as 200-300%. However, just because such profits are possible, or have happened to some degree in the past, does not mean that the Commercial's total message is not misleading. See JCC, 63 F.3d at 1568 n. 34. Even literally true statements can be extremely and impermissibly deceptive when viewed in their overall context. See, e.g., In re Staryk, Comm. Fut. L. Rep. at 45,809.

. This Circuit has clearly explained previously that brokers must be extremely careful when making representations in the commodities market because the standard pro forma risk disclosures do not "warn the customer to disbelieve representations that certain trading strategies can ... overcome inherent market risks, or that certain commodities are less volatile. Those unfamiliar with the workings of markets are unlikely to understand that no broker can eliminate or diminish risk.” Clayton, 794 F.2d at 580-81 (emphasis added). We note that RJFCO designed its business specifically to deal with smaller, less experienced customers. See R.J. Fitzgerald, 173 F.Supp.2d at 1297.

. RJFCO’s principal, Raymond Fitzgerald, testified that more than 95% of Defendants’ customers lost money.

. One RJFCO customer testified at trial that if he had been told during a telephone solicitation that about 96% of RJFCO customers lost money, he probably "would have hung up the phone.”