In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1809

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee,*

*v.*

JAMES A. DONELSON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-03758 — **Thomas M. Durkin**, *Judge.*

———————————

ARGUED JANUARY 18, 2024 — DECIDED SEPTEMBER 5, 2024

———————————

Before RIPPLE, BRENNAN, and SCUDDER, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Long Leaf Trading Group provided trade recommendations to customers in the commodities markets and connected them with a merchant who could execute the trade. The company made money when it received commissions on completed trades. When James Donelson became CEO, Long Leaf proved itself adept at taking commissions but inept at making recommendations. The company collected $1,235,413 in commissions from its

customers who participated in one particular investment program. Yet during that same time customers incurred losses totaling $2,376,738.

After an investigation, the Commodity Futures Trading Commission filed a civil enforcement action against the company, Donelson, and others, charging them with options fraud and five other violations of commodities laws. The district court granted summary judgment to the CFTC against Donelson on all but one count. Donelson appeals.

## I

### A

Long Leaf is an introducing broker, which means it is a middleman between the client and the merchant responsible for making trades. As a middleman, Long Leaf recommended trades to its clients. When the client accepted a recommendation through an associated person (an individual acting as a salesperson for the firm), Long Leaf would forward the customer order to its merchant to be executed. Then Long Leaf would get a cut.

As Long Leaf was collecting commissions, its trading strategies were not paying off. While James Donelson was CEO of Long Leaf, the company lost more than $2 million for customers who participated in one particularly bad strategy: "Time Means Money" ("TMM"). The TMM program began in June 2015, and 80 percent of Long Leaf's customers participated. When Donelson became Long Leaf's CEO in December 2017, TMM was still active.

That strategy was impressive for its failure. Throughout Donelson's time at Long Leaf, "nearly all Long Leaf patrons who participated in TMM lost money." Donelson was not

blind to the program's performance or to his customers' frustration with it. He received daily customer account statements; he conducted a "five-month look-back" of the program, where he learned of the consistent losses; and customers called and emailed him with complaints. Donelson claims he eventually abandoned TMM for a new strategy after evaluating TMM's performance. And at his deposition, he discussed what might be a third strategy—the "gut strangle." Whatever strategy it pursued, Long Leaf lost money.

During his tenure as CEO, Donelson (sometimes through Long Leaf) engaged in acts and omissions that the CFTC would eventually allege constituted fraud.

*1. Long Leaf's history of losses.* Throughout his tenure, Donelson never communicated that Long Leaf was consistently losing money. His predecessor implemented a policy prohibiting Long Leaf's associated persons from disclosing TMM's performance history. If customers asked, the associated persons would not answer, citing the policy. Donelson continued this policy but had the associated persons redirect the conversations using template responses which did not answer the customers' questions. Neither current nor prospective customers were ever informed of Long Leaf's poor track record.

*2. Target return rates.* Donelson also directed Long Leaf's associated persons to tell prospective customers that their "strategies" targeted a 6 to 12 percent annual return.

*3. Trade history & new track record emails.* In February 2019, Donelson sent a prospective customer an email with a "trade history." This included a selection of seven of the trades Long Leaf recommended from August 2018 to January 2019. In aggregate, these trades had an average return of 1.68 percent.

But across all its accounts during that period, Long Leaf customers had lost $323,932. Then, in May 2019, Donelson sent Long Leaf's associated persons an email with a file called "track record," which showed several transactions, reflecting a return of $460.23 on trades recommended between July 2018 and May 2019. The trades were "real" in that Long Leaf recommended them and customers asked for them to be executed. But no single customer received that exact set of trades. And again, the full picture was much bleaker: customers lost $538,618 during that period.

*4. Donelson's experience.* In February 2018, Donelson told customers that he had "ten years of financial and business development experience at two of the largest proprietary trading firms." Donelson had never worked in trading before. His only options trading experience was in a single trade in which he lost $30,000.

**B**

In June 2020, the CFTC brought a civil enforcement action against Donelson, Long Leaf, Donelson's predecessor, and two of Long Leaf's associated persons.

The CFTC charged Long Leaf and Donelson with six violations of the commodities laws. The Commission alleged Donelson was liable for Long Leaf's conduct as to each violation. Secondary liability in financial-regulatory enforcement actions attaches based on how much control a person has over the principal violator. The CFTC alleged Donelson was liable for Long Leaf's conduct because he was one of its controlling persons.

The charges were:

- Claim I: Options fraud;

- Claim II: Fraud by a commodity trading advisor ("CTA");

- Claim III: Fraudulent advertising by a CTA;

- Claim IV: Failure to register as a CTA;

- Claim V: Failure to provide CTA disclosures;

- Claim VI: Failure to register as associated persons.

The CFTC moved for summary judgment against Donelson and Long Leaf in November 2021. The district court agreed with the CFTC on every claim except the part of Claim VI charging Donelson with secondary liability for allowing a Long Leaf employee to work as an associated person without proper registration.[1]

The district court's resolution of two claims—options fraud and failure to register as a CTA—are especially important for Donelson's appeal. First, the court agreed with the CFTC that the four incidents italicized above constituted fraudulent acts or omissions supporting the options fraud claim. Donelson had argued that he did not need to disclose Long Leaf's past failures, but the court disagreed: "A reasonable investor would want to know" such a "history of losing customers' investments." Second, the court determined that

---

[1] Donelson addresses Claim VI in his brief but he does not suggest the district court's ruling was erroneous. He says, "[l]ate registration is settled by a small fine" and "[l]ate registration filing could not be a cause of any loss to a customer either."

Even assuming this is an argument for error, it fails. The CFTC has authority to bring a civil action for "any act … constituting a violation of any provision" of the commodities laws. 7 U.S.C. § 13a-1(a). And it has discretion to impose civil penalties for those violations. *Id.* § 13a-1(d)(1).

Long Leaf should have registered as a CTA. Donelson had argued that Long Leaf was exempt under 17 C.F.R. § 4.14(a)(6). Relying on an interpretive letter the CFTC published, the court explained that Long Leaf did not qualify for the exemption because it was "guiding" its customers' accounts.

The court ordered Donelson to pay restitution in the amount of the customers' losses during his tenure as Long Leaf's CEO. This included trading losses as well as commissions—$2,376,738—and disgorgement of the commissions Long Leaf collected during the same period—$1,235,413 (as offset by anything Donelson paid toward restitution). Donelson is the only one who has appealed.

## II

Donelson appeals the grant of summary judgment to the CFTC on every claim it brought against him except Claim VI, failure to register as an associated person. We will address the five claims Donelson asks us to reverse by addressing four interrelated issues. The chart below identifies those issues and the claims to which they apply.

|  | Options fraud | CTA fraud | Fraudu- lent adver- tising by a CTA | Failure to register as a CTA | Failure to make CTA disclo- sures |
|---|---|---|---|---|---|
| *Did Donel- son's and Long Leaf's actions con- stitute fraud?* | X |  |  |  |  |
| *Is Long Leaf a CTA?* |  | X | X | X | X |
| *Was Long Leaf required to register as a CTA?* |  |  |  | X | X |
| *Is Donelson a controlling person of Long Leaf?* | X | X | X | X | X |

First, we will discuss whether Donelson and Long Leaf committed options fraud. We will focus on the misstatements the CFTC alleged Donelson and Long Leaf made about Long Leaf's investment strategy, performance history, and Donelson's experience. Second, we will examine whether Long Leaf acted as a CTA by giving advice to its clients on the viability of trades in commodity options. Third, we will answer the question whether a regulation exempted Long Leaf from a rule requiring CTAs to register. We will conclude by

addressing Donelson's argument that he was not so in control of Long Leaf that he could be held responsible for its violations of the commodities laws.

This court reviews an appeal from a summary judgment order de novo, "construing the record in the light most favorable to [the non-movant] and drawing all reasonable inferences in his favor." *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020).

## A

The CFTC charged Donelson and Long Leaf with options fraud under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10.[2] To resolve this claim, we must decide whether Donelson's and Long Leaf's actions constituted fraud.

The Commodity Exchange Act broadly prohibits fraud in options transactions. A person or business association may not "enter into or confirm the execution of[] any transaction involving" an option if that transaction is "contrary to any rule, regulation, or order of the [CFTC] … ." 7 U.S.C. § 6c(b). Fraudulent transactions are contrary to CFTC regulations:

> It shall be unlawful for any person directly or indirectly:
>
> > (a) To cheat or defraud or attempt to cheat or defraud any other person;

---

[2] The CFTC also charged Donelson with violating two other antifraud provisions: fraud by a CTA, 7 U.S.C. § 6*o*(1), and fraudulent advertising by a CTA, 17 C.F.R. § 4.41(a). Donelson's sole argument that the district court erred by ruling for the CFTC on these claims is that Long Leaf was not a CTA. We will discuss these two provisions in the next section.

(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever

in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10.

This court has not determined the elements of fraud under Rule 33.10, but this is not a complicated task. "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Neder v. U.S.*, 527 U.S. 1, 23 (1999); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (quotations omitted). In other statutes prohibiting fraud, the Supreme Court has explained that "defraud" takes the common-law definition of "fraud." *Neder*, 527 U.S. at 22–23 (mail fraud); *Escobar*, 579 U.S. at 187 (Fales Claims Act).

Common-law fraud has three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality. *See Escobar*, 579 U.S. at 187 (misrepresentations—affirmative and by omission—were elements of common-law fraud); *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023) (scienter, same); *Neder*, 527 U.S. at 22–23 (materiality, same).

Other circuits have applied those elements to Rule 33.10(a). *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002); *CFTC v. Kratville*, 796 F.3d 873, 891, 885 n.8 (8th Cir.

2015); *see also SEC v. Lee*, 720 F. Supp. 2d 305, 323, 324 (S.D.N.Y. 2010). At least one circuit has also included proof of reliance in a CEA fraud action, *see FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1384 (10th Cir. 1998), but CFTC brought this action so reliance is not at issue, *Slusser v. CFTC*, 210 F.3d 783, 785–86 (7th Cir. 2000) (analyzing Section 6b). The CFTC defends the markets from misstatements. It need not be misled by a misstatement to carry out that duty.

The district court ruled that Long Leaf made four misrepresentations or omissions which constituted fraud under Rule 33.10(a). These arose from the four acts or omissions listed above in section I.A. Donelson argues that none of these are misrepresentations. We disagree.

"[C]ommon-law fraud has long encompassed certain misrepresentations by omission … ." *Escobar*, 579 U.S. at 187. These "half-truths" are "representations that state the truth only so far as it goes, while omitting critical qualifying information … ." *Id.* at 188. Long Leaf's four misrepresentations—the trade history and new track record emails, the targeted return rate messaging, Long Leaf's history of losses, and Donelson's experience—fall into the half-truth bucket.

*Trade history & new track record emails.* Donelson sent at least two trade histories to customers (either personally or through Long Leaf's associated persons), both of which featured a list of profitable trades. The most problematic one is the "new track record" email, which included a set of trades between July 2018 and May 2019 yielding a 0.63 percent return. Donelson contends these were demonstrative exhibits of "what was believed to be the viability of [Long Leaf's] model," meaning they did not misstate anything. He

explained at his deposition that these are the trades consistent with a new strategy he implemented called the "gut strangle."

But this was a hypothetical portfolio. Although the trades actually happened, Long Leaf did not advise a single customer to make that set of trades. Donelson testified to this too: "I don't believe any one person had every one of those trades." At Donelson's request, Long Leaf's associated persons sent this "new track record," with no explanation, to clients and prospective customers. So the trade history documents implied—falsely—that Long Leaf achieved those kinds of returns for its customers on each trade set.

Courts have long frowned upon statements that mislead by omission. In *Escobar*, the Supreme Court explained the common-law fraud approach to half-truth misrepresentations. 579 U.S. at 188–89. The Court discussed a 1931 New York Court of Appeals contract law case about an actionable half-truth. *Id*. In that case, a real estate seller disclosed two streets projected to be constructed near the property for sale. *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. 1931) (Cardozo, J.). But a third road was projected which, if constructed, would bisect the property. *Id.* The seller's incomplete disclosure "was a tacit representation that the land to be conveyed was subject to no others." *Id.* Thus, it was a fraud.

Here, the trading history documents are like the seller's promise that two roads might appear near the property. True on its face (Long Leaf recommended all the trades), the documents inaccurately represented that a *single* Long Leaf customer could have held this exact portfolio. As in *Junius Construction*, what Long Leaf omitted—this is hypothetical, this is a projection, and no Long Leaf customer experienced

this return—"materially affect[ed] the value of" Long Leaf's communication. *Id.*

*Targeted return rates*. Donelson directed the associated persons to tell prospective and current customers that Long Leaf's "strategies target 6 to 12 percent returns on an annual basis." He argues this was not a misrepresentation because it is a reasonable projection. Again, we disagree. In the related Rule 10b-5 context, a projection is misleading if "it was not made in good faith or was made without a reasonable basis." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995). Against the backdrop of Long Leaf's pattern of losses, Donelson does not offer a reasonable basis for the projection, so the district court did not err in finding that the target return rate statement was misleading.

*History of losses*. Donelson argues that he was under no duty to disclose Long Leaf's history of losing its clients' money, meaning the district court erred by concluding it was a misrepresentation.

Donelson may have a point. Omissions or failures to disclose "will not support a common law fraud claim." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 649 (7th Cir. 2019) (discussing "common law tort of fraud" in Illinois law); *Midwest Com. Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993) (same, but Indiana law); RESTATEMENT (SECOND) OF TORTS § 551 (1977) (discussing this rule); *see Escobar*, 579 U.S. at 188 (stating general principle that failures to speak are not sufficient for common-law fraud). On the other hand, these statements "may be actionable as constructive fraud or fraudulent concealment if the defendant was under a particular duty to speak … ." *Nelson*, 928 F.3d at 649; RESTATEMENT § 551(2)(a).

There is no genuine dispute of material fact that Donelson made affirmative misleading statements implying that Long Leaf's trading was profitable. The trading history documents, for example, communicated two half-truths. First, as discussed, they falsely implied that a customer received that recommendation. But second, they implied that this period was a profitable one for Long Leaf. In fact, Long Leaf customers actually lost $538,618 during that same period.

The targeted return rate projection also communicated two half-truths. First, as discussed, it falsely implied that Donelson and Long Leaf had a reasonable basis to make the projection. But second, it implied that the projection was made in good faith. Long Leaf's consistently poor track record makes it hard to believe that anything other than bad faith brought about that projection.[3]

---

[3] Donelson challenges the district court's materiality and scienter determinations only on its decision that he should have disclosed Long Leaf's losses to his customers. We have agreed with the district court that his failure to disclose is grounds for liability through the half-truths this failure to disclose created based on his other two affirmative misstatements.

Even in this context, Long Leaf's omitted performance history is material and Donelson omitted it with scienter. It was material because it "'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'"—the trade history and new track record emails and the targeted return rate messaging materials were only persuasive as indicators of positive upward movement for Long Leaf's investment recommendations. *Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (discussing materiality in the context of the related Rule 10b-5 context). And Donelson acted with scienter, which is the "intent to deceive or manipulate," when he took deliberate steps to obscure its performance history by directing Long Leaf's associated

*Donelson's experience*. Last, Donelson told customers that he had "10 years" of experience at major proprietary trading firms, when he had never before worked in trading and his only prior experience was limited to a single trade.

This is a half-truth too. It is "critical qualifying information" that his experience at the proprietary trading firms was not in a trading role. *Escobar*, 579 U.S. at 187. He said in the letter that he would be working on the trading strategy and, in testimony, acknowledged that customers wouldn't have trusted him if they knew he had no profitable trading experience.

The district court correctly decided that there is no genuine dispute of material fact that Donelson committed options fraud.

**B**

CFTC also charged Long Leaf with four violations of commodities regulations that apply only to CTAs: fraud by a CTA, 7 U.S.C. § 6*o*(1); fraudulent advertising by a CTA, 17 C.F.R. § 4.41(a); failure to register as a CTA, 7 U.S.C. § 6m(1); and failure to make the disclosures required of some CTAs, 17 C.F.R. §§ 4.31(a), (b) & 4.36(d)(1). To resolve these four claims, we must answer the question whether Long Leaf was a CTA.

A CTA is any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the

---

persons not to disclose that history and to redirect questions about it. *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (discussing scienter in the context of the related Rule 10b-5 context); *Schutte*, 598 U.S. at 750.

value of or the advisability of trading in … any commodity option authorized under section 6c of this title … ." 7 U.S.C. § 1a(12)(A)(i)(III). This includes a publisher of financial recommendations, even where the publisher's recommendations are impersonal. *Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 687 (7th Cir. 1998) ("The broad sweep of 7 U.S.C. §§ 1a(5)(A)[4] & 6m(1), by their plain terms, covers impersonal—as well as personalized—advice.").

The district court correctly found that Long Leaf is a CTA and was acting as one throughout Donelson's tenure as CEO. Donelson's own words confirm this. As he explains, Long Leaf "recommended transactions to consumers" as part of its brokerage activities. Once customers confirmed the recommended trade, Long Leaf forwarded it to a futures commission merchant and earned a commission. In other words, Long Leaf advised clients for profit as to the advisability of trading in commodity options, which fits it within the Act's definition. *See* 7 U.S.C. § 1a(12)(A)(i).

Donelson objects to that finding and cites two out-of-circuit, district court cases as support for reversing. Per Donelson, the first case, *Taucher v. Born*, 53 F. Supp. 2d 464 (D.D.C. 1999), found that the plaintiffs were not CTAs. Quoting *Taucher*, Donelson says they did not "engage in individual consultations with their customers regarding their standard advice and recommendations and under no circumstances do they make trades for their customers," having instead to go through "some other licensed broker."

---

[4] This is the earlier version of the statute defining a CTA. *See Commodity Trend Serv.*, 149 F.3d at 681. The language is the same, as relevant for this case.

But *Taucher* holds the opposite: "Each of the plaintiffs in this case falls squarely within the definition of a CTA. They engage in the business of advising others, through publications, writings and electronic media, as to the value of or the advisability of trading in the futures market, and they do so for compensation or profit." *Id.* at 475. *Taucher* was an as-applied First Amendment challenge to the registration requirement by publishers of financial advice. Donelson quotes a part of *Taucher* explaining that as applied to publishers, the registration requirement is not a regulation of a profession (allowed) but a regulation of speech (suspect). *Id.* at 476, 478.

The second case he cites, *CFTC v. AVCO Fin. Corp.*, 979 F. Supp. 232, 234 (S.D.N.Y. 1997), also does not help him. There, the court held a company that "promoted itself to actual and potential customers as providing highly profitable commodity futures trading advice through [a trading] program" was a CTA. 979 F. Supp. at 236.

Even if *Taucher* or *AVCO* drew a line between personal and impersonal advice, the text of the statute does not. The CTA definition is "broad"—"broad" enough to include both types of advice. *Commodity Trend Serv.*, 149 F.3d at 687. Thus, we agree with the district court that there is no genuine dispute of material fact that Long Leaf was acting as a CTA.

## C

Two of these claims—failure to register as a CTA, 7 U.S.C. § 6m(1), and failure to make the disclosures required of some CTAs, 17 C.F.R. §§ 4.31(a), (b) & 4.36(d)(1)—warrant further discussion.

CTAs cannot "unless registered under this chapter … make use of the mails or any means or instrumentality of

interstate commerce in connection with [their] business as such commodity trading advisor … ." 7 U.S.C. § 6m(1). If a CTA is required to be registered, it must make certain disclosures. *See, e.g.*, 17 C.F.R. § 4.31(a).

Donelson argued before the district court, as he does here, that Long Leaf was not required to be registered because a CFTC regulation exempted the company. The CFTC has said that a CTA registered as an introducing broker need not also register as a CTA if its "trading advice is solely in connection with its business as an introducing broker." *Id.* § 4.14(a)(6). Therefore, to resolve Donelson's appeal of these two claims, we must determine whether Long Leaf was exempt.

The district court asked whether Long Leaf "'guid[ed]' trading in a majority of its customers' accounts"—if yes, the exemption would not apply. Because the court found that Long Leaf was indeed guiding trades in its customers' accounts, Long Leaf was required to register.

This "guiding trades" language comes not from the text of Regulation 4.14(a)(6) but from a CFTC comment letter. *See Clarification of Issues Concerning Guided Accounts of Introducing Brokers and Futures Commission Merchants*, CFTC Div. Trading & Markets Comment Letter, CFTCLTR No. 95-82, 1995 WL 707862 (Sept. 19, 1995). In the letter, the CFTC explained that a correspondent had asked whether an introducing broker that "guides" customer accounts is required to register as a CTA. *Id.* at *1. By "guided" account, the CFTC and the correspondent meant 1) the customer has orally authorized the introducing broker to initiate a trade, and 2) the introducing broker "inform[s]" the account "to purchase or sell, the price …[,] and the number of contracts … ." *Id.*

The CFTC answered in the negative. *Id.* Citing "concerns as to the possible misuse of the exemption," the agency established a line: If the introducing broker is "guiding" trading in more than half of its accounts, it must register; if not, it might be required to register. *Id.* at *2. The comment letter neither attempts nor achieves a close reading of the text of Regulation 4.14(a)(6). To understand what the regulation means, we undertake that close reading.

We start with a definition of "trading advice"—a recommendation as to the value of a financial transaction for profit. This is confirmed by the Commodity Exchange Act, which necessarily defines trading advice while defining "commodity trading advisor":

> The term 'commodity trading advisor' means any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in [a commodity] [or] for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of [these] activities … .

7 U.S.C. § 1a(12)(A) (internal subsection organization omitted).

Next, the regulation restricts the type of trading advice an introducing broker/CTA can give without complying with the registration requirement. First, it requires that the trading advice be "in connection with the business as an introducing broker." 17 C.F.R. § 4.14(a)(6)**.** Second, it requires that the

trading advice be "*solely* in connection with" that business. *Id.* (emphasis added).

The term "business as an introducing broker" also refers to the CEA, which defines "introducing broker." Per the CEA, an introducing broker is

> [A]ny person who is engaged in soliciting or in accepting orders for
>
>> the purchase or sale of any commodity for future delivery, security futures product, or swap;
>>
>> any agreement, contract, or transaction described in [other parts of the CEA];
>>
>> any commodity option authorized under section 6c of this title; or
>>
>> any leverage transaction authorized under section 23 of this title; and
>
> does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom … .

7 U.S.C. § 1a(31)(A) (internal subsection organization omitted). The function of an "introducing broker"—its business— is therefore its role as a financial-transaction middleman. It solicits or accepts buy/sell orders for commodities, *id.* § 1a(31)(A)(i)(I), and does not margin, guarantee, or secure resulting trades or contracts, *id.* § (31)(A)(i)(II).

The regulation specifies that any trading advice must be "solely" in connection with this business. "Solely" is an exclusive word, requiring a perfect match between the clause that

precedes it and the word or phrase that it modifies. *See* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–75 (2012). Contrast "David was solely concerned with defeating Goliath" with "David was concerned with defeating Goliath." "Solely" in the first sentence communicates that David has a single concern: defeating Goliath. Its absence in the second sentence relays a different proposition: David might have many concerns, one of which is defeating Goliath.

Here, "solely" is a qualitative limiter. The "sole" type of trading advice an IB/CTA may give is advice in connection with its business as an introducing broker. To state the contrapositive, if an IB/CTA gives any advice *not* in connection with its business as an introducing broker, it is required to register. *See Udiskey v. Commodity Res. Corp.*, CFTC No. 98-R081, at *73–75 (April 2, 1999) (reaching the same conclusion when interpreting Regulation 4.14(a)(6)). Thus, the exception does not apply if an introducing broker/CTA gives any advice not in connection with its role as a solicitor or accepter of buy/sell orders in commodities.

The CFTC comment letter raises a policy objection to this broader reading of the exemption. We understand that the CFTC might have concerns with the scope of their regulation. The agency has been concerned about the scope of Regulation 4.14(a)(6) since it first drafted the rule. *See Udiskey*, CFTC No. 98-R081 at *75 n.171. In a Federal Register entry discussing the rule, the CFTC stated it would monitor the exemptions and make changes if abuse occurred. *Id.* The agency has often cited this practical concern to cabin the exemption—for example, "as a basis to hold that, if an IB provides advice too often or to too many customers, it does not qualify for the

exemption … ." *Id.* Regulation 4.14(a)(6) could be read to deprive the investing public of important disclosures in an area prone to fraud.

Fortunately, if the CFTC wishes to narrow the exemption, it can do so without help from us. It is a rule the CFTC wrote, submitted for notice and comment, and enacted. The Administrative Procedure Act, 5 U.S.C. § 553, gives the CFTC all the authority it needs to repeal and replace Regulation 4.14(a)(6).

The record contains much evidence of the trading advice Long Leaf provided to its brokerage customers through TMM and its other trading programs. But we have not located any evidence of Long Leaf providing trading advice to non-brokerage customers. Nor have we located any evidence of Long Leaf providing advice on matters not within the scope of its role in soliciting or accepting buy/sell orders for commodities. In fact, Donelson testified at a deposition that Long Leaf's introducing brokerage activity was its sole source of business:

> There's two revenue streams, obviously the trading revenue and then they also had an introducing broker revenue from a European CFD dealer—contract for difference dealer—from one of their customers overseas. And that was in their—in the parlance would be it's almost pure profit. They don't really do anything. They just receive an introducing broker fee.

We cannot say that, in the light most favorable to Donelson, the evidence shows that Long Leaf provided trading advice outside its business as an introducing broker. But a deeper review consistent with the text of Regulation 4.14(a)(6) might reveal new evidence that does so demonstrate. The

district court should have the first chance to decide whether the exception applies. The CFTC also charged Long Leaf with failing to make disclosures required of some CTAs. The district court should reconsider that claim—Claim V—and reevaluate whether all CTAs must make those disclosures or only CTAs required to be registered.

## D

The CFTC also charged Donelson with secondary liability for Long Leaf's violation of every claim discussed. The final question for us is whether Donelson was in fact a controlling person of Long Leaf, such that he could be subject to liability on its behalf.

Any person who directly or indirectly "controls" a primary violator of the commodities laws "may be held liable for such violation in any action brought by [the CFTC] to the same extent as [the] controlled person." 7 U.S.C. § 13c(b). The CFTC has the burden of proof, and must prove the controlling person "knowingly induced, directly or indirectly, the … acts constituting the violation" or "did not act in good faith." *Id.* Bad faith includes a reckless failure to "maintain a reasonably adequate system of internal supervision and control … ." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993). Negligence is insufficient. *Id.*

Controlling person liability has two prongs. First, the person must have control. *Id.* at 859. Second, the CFTC must prove the person acted without good faith or knowingly induced the acts. *Id.* at 860.

The district court found that Donelson was a controlling person of Long Leaf. He does not dispute that he had control, and in fact admitted it before the district court. His sole

argument about his role in the charged conduct is that "[a]t best, negligence is shown here."

But the evidence is to the contrary. Donelson knowingly induced the misstatements supporting the three fraud claims. Long Leaf did not disclose its losses because Donelson maintained an existing policy and established a new one forbidding associated persons to do so. Donelson personally sent the track record document to the associated persons and directed them to distribute to their current and prospective customers. He also provided the associated persons with a Powerpoint presentation showing the 6 to 12 percent return projection and directed them to market in soliciting customers. In each instance the information suggested that Long Leaf's recommendations were more profitable than they were. Long Leaf's associated persons spread both, with Donelson's blessing.

Donelson also knowingly induced the CTA claims. He did not register Long Leaf as a CTA or make the required disclosures. So, his negligence argument does not follow; he intentionally did not register Long Leaf because he believed it was not a CTA.

We agree with the district court that there is no genuine dispute of material fact that Donelson was a controlling person of Long Leaf.

## III

While at Long Leaf's helm, Donelson made many decisions that steered the company and himself into regulatory trouble. Most importantly, he oversaw a dishonest marketing approach that covered up substantial problems with the company's investment-recommendation strategies. The district

court correctly concluded that there was no genuine dispute of material facts as to the CFTC's three fraud claims, Long Leaf's identity as a CTA, and Donelson's role as a controlling person of the company. But it is not clear that Long Leaf was required to register as a CTA, even though it was one.

For those reasons, we AFFIRM the district court's entry of summary judgment in part. As to Claims IV and V, the two claims dependent on whether Long Leaf was required to register as a CTA, we REVERSE the district court's entry of summary judgment and REMAND for proceedings consistent with this decision.