**COMMODITY FUTURES TRADING COMMISSION, plaintiff,**

v.

**UNITED INVESTORS GROUP, INC., et al., defendants.**

No. 05–80002CIVHURLEY.

United States District Court, S.D. Florida.

May 18, 2006.

Order Granting in Part and Denying in Part Reconsideration June 28, 2006.

Charles D. Marvine, Rachel A. Hayes, Commodity Futures Trading Commission, Div. of Enforcement, Kansas City, MO, Richard A. Glaser, Commodity Futures Trading Commission, Div. of Enforcement, Washington, DC, for Plaintiff.

Erik Bradley Weinick, Bilzin Sumberg Baena Price & Axelrod LLP, Miami, FL, R. Lawrence Bonner, Francisco Oscar Sanchez, Homer Bonner & Delgado, Miami, FL, for Defendants.

Rhett Traband, Broad & Cassel, Miami, FL, Mark Francis Raymond, for Lewis B. Freeman.

## MEMORANDUM OPINION AND FINAL JUDGMENT OF INJUNCTIVE AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT JAY M. LEVY

HURLEY, District Judge.

**THIS CAUSE** is before the court upon the complaint of the Plaintiff Commodity Futures Trading Commission (CFTC) alleging that defendants United Investors Group, Inc., Greg P. Allotta, Jay M. Levy, Paul F. Punkett, Andrew D. Ross and Michael Savitsky III misrepresented facts and omitted pertinent information when soliciting customers to engage in speculative trading of commodity futures in violation of the Commodity Exchange Act ("CEA"). In its Complaint, the Commission seeks permanent injunctive relief en-

joining defendants from engaging in any commodity related activity, and compelling their compliance with the Act and Regulations. In addition, the Commission seeks civil monetary penalties, restitution, disgorgement, plus prejudgment and postjudgment interest.

At the commencement of trial, the Commission announced a tentative settlement of its claims against all defendants, save Jay M. Levy ("Levy").[1] The trial accordingly proceeded against Levy upon the charge that he committed sales solicitation fraud in violation of Section 33.10 of the Regulations, 17 C.F.R. § 33.10, and Section 4c(b) of the Commodity Exchange Act ("CEA") as amended, 7 U.S.C. §§ 1 *et seq.*

Section 33.10 of the Regulations provides in pertinent part:

It shall be unlawful for any person directly or indirectly:(a) To cheat or defraud or attempt to cheat or attempt to cheat or defraud any other person ... (c) To deceive or attempt to deceive any other person by any means whatsoever in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

Levy's alleged violation of Section 33.10 is the premise of the alleged violation of 7 U.S.C. § 6c(b), which provides:

No person shall ... enter into or confirm the execution of any transaction involving any commodity regulated under this Act... contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

The witnesses at trial consisted of five customers of United Investors Group, Inc. who dealt with defendant Jay Levy (Scott Anderson, Carrie Allsopp, David Cuthbertson, Charles Jeffrey Thompson, and Sergeant Lanzy Williams), defendant Jay Levy, two customers of United Investors Group who dealt with other APs (Terry Ann Landt, John Manders), CFTC forensic investigator Lacy Dingman, and the Chief Operating Officer of the National Futures Association, David Driscoll. The trial exhibits included audiotapes of conversations between Levy and his customers and various documentary exhibits.

Having carefully reviewed all the testimony and exhibits admitted at the seven day bench trial conducted between March 22, 2006 and April 3, 2006, together with the parties' posttrial filings, the court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. United Investors Group

United Investors Group (UIG) is a Florida corporation located in Boca Raton, Florida. UIG was registered with the Commodity Futures Trading Commission as an Introducing Broker (IB), which is defined under the Commodity Exchange Act to include "any person ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market ... who does not accept any money, securities, or property."[2] The term "person" is further defined under the Act to include corporations.[3]

---

1. The Commission since submitted, under seal, a proposed consent decree disposing of the claims against the settling defendants which, per the parties' stipulation, shall not be considered by the court until *after* conclusion of the trial and entry of final judgment resolving all claims against the remaining defendant Levy.

2. Section 1a(23) of the Act, 7 U.S.C. § 1a(23).

3. Section 1a(28) of the Act, 7 U.S.C. § 1a(28).

UIG was engaged in the business of soliciting customers to purchase options through Universal Financial Holding Corporation (UFHC), a Futures Commission Merchant (FCM), and employed Associated Persons (APs) to conduct this business. An AP is any natural person associated with an FCM or IB, who (i) solicits or accepts customers' or options customers' orders, or (ii) supervises any person or persons so engaged.[4]

## B. Jay M. Levy

Jay M. Levy (Levy) first registered with the Commission as an AP in 1998 (Plaintiff's Exhibit 4), and first registered as an AP with UIG in 2003.

### 1. Prior Violation History

Before registering as a UIG AP in 2003, Levy worked at four different firms, including three firms that were disciplined by the National Futures Association (NFA) as a result of alleged sales practice violations.[5] Individually, Levy has been a subject of two NFA Business Conduct Committee complaints that resulted in the NFA's assessment of a $20,000 fine against him together with three months enhanced supervisory procedures. (Plaintiff's Exhibit 4).

On May 15, 2003, a Designated Panel of the NFA's Business Conduct Committee issued its decision in *In re: Group One Financial Services, Inc. & Jay M. Levy*, NFA Case No. 02–BCC–021. (Plaintiff's Exhibit 4, beginning at Bates UIG 005 000678) As part of the settlement of that action, Levy consented to findings that he committed the violations alleged against him in the Complaint in NFA Case No. 02–BCC–021. (*Id.*, UIG 005 000680) The

Complaint alleged that, while serving as an AP at Group One Financial Services, Inc. (Group One), Levy violated NFA Compliance Rule 2–2(a), which provides that no member shall cheat, defraud or deceive, or attempt to cheat, defraud, or deceive, any commodity futures customer, as well as NFA Compliance Rule 2–29(a)(1), which provides that no member shall make any communication with the public which operates as a fraud or deceit. (*Id.*, UIG 005 000685).

The Complaint also alleged, and Levy agreed, that in March and April 2001, Levy made misleading and deceptive sales solicitations to Group One customer Ignacio Gonzalez (*Id.*, UIG 005 000685). These solicitations included the following pitch:

> I have something right now that I've been researching ... that I started putting people into the market very recently ... [a]nd I think it's an opportunity that you can act quickly to make a lot of money.

> I have something right now that I think can make you a lot of money fast.

(*Id.*, UIG 005 000686–87) Levy also told Mr. Gonzalez that a $17,000 investment in Yen puts could "all of a sudden [be] worth over $300,000," and he pressured Mr. Gonzalez to invest immediately before the market moved down any further. (*Id.*, UIG 005 000687)

The NFA's Business Conduct Committee found and Levy agreed that "[t]here was no rationale" for Levy's recommendations that Mr. Gonzalez purchase additional Yen put options "except to generate commissions for Group One." (*Id.*, UIG 005 000688). Finally, the NFA's Business Conduct Committee found and Levy

---

**4.** *See* Regulation 1.3(aa)(1) & (2), 17 C.F.R. § 1.3(aa)(1) & (2).

**5.** The fourth firm is named as a defendant in another solicitation fraud suit filed by the Commission in 2004 which is also pending in this division, *CFTC v. First American Investment Services, Inc., et al.,* (Case No. 04–60744–CV–HURLEY).

agreed that his sales solicitations to Mr. Gonzalez "painted a misleading and overly optimistic picture of the profit potential of trading Yen put options" and that Levy's solicitations "included no discussion of the high risk and speculative nature of options and, instead, suggested that large profits were a near certainty." (*Id.*, UIG 005 000688)

## 2. Transgressions at UIG

Since at least August 2003, UIG APs Levy, Gregory Atz (Atz), Tony Bobba (Bobba), Duane Haughton (Haughton), Vincent Monti (Monti), Harris Shapiro (Shapiro), and Gerald Sipes (Sipes), solicited members of the general public to open accounts to trade options. Levy's normal practice was to speak with UIG customers that had dealt with another UIG broker previously. Levy spoke with customers from all over the United States, Canada, and the United Kingdom; more than twenty of Levy's approximately seventy-five customers were from outside of the United States. (Plaintiff's Exhibit 8).

When soliciting investors to deposit funds, Levy typically had another AP make initial contact with a potential customer. To induce a trade, the initial AP began by misrepresenting the risks and rewards of trading options, and then, after falsely exaggerating the financial wizardry of Levy, handed the customer over to Levy for the close.

Both the initial AP and Levy promised high return on the investment with virtually no risk of loss. Customers were specifically told that stop loss orders would be placed to protect their investment, and that there was therefore little risk in trading. After hooking the initial trade, Levy ultimately recommended that the customer continue to make options trades until the customer ran out of money.

Levy vehemently denied engaging in these sales ploys. Essentially, he claimed that every customer who testified against him in this proceeding was "absolutely lying." Instead of misleading clients with talk of high profits and non-existent risk, he claims to have discussed the numerous factors and variables affecting the risk of commodity option trading with his clients, and claims that they acknowledged those risks both orally and in writing before placing trades. He also claims to have personally reminded each client that trading commodity options involves significant risks, and that neither he nor any other UIG personnel could guarantee a profit on any given trade.

The court finds this testimony incredible. First, there is a problem with Levy's selective memory: While he claims to recall in great detail his specific conversations with each of the testifying customers, he cannot recall any specifics regarding the "few" improper sales solicitations he admitted to making, or the improper sales solicitations he recalls witnessing at UIG.

Second, Levy's testimony is rife with internal inconsistencies tripped by his self serving memorializations of material events. For example, when first questioned about the complaint and decision of the NFA's Business Conduct Committee with regard to Levy's tenure at Group One, Levy flatly denied that he had consented to any findings of fact in resolving the matter, and denied that he engaged in improper behavior with respect to the matter. After the Group One complaint and decision were in evidence, however, Levy admitted that the exchange between he and the Group One customer identified in the complaint took place and that what Levy said was improper. This admission is in direct contradiction to Levy's protestation that he never made claims about profit potential that he could not back up.

Levy was also evasive in his testimony about the amount of money he made at

UIG. Bank records of Levy and UIG show that he earned $416,691.30; Levy, however, testified that he did not receive this amount from UIG's bank accounts. Even after verifying that he received and endorsed checks totaling $416,691.30 from UIG bank accounts, Levy still contested that he received this much money from UIG.

Finally, Levy's testimony is belied by the testimony of the five UIG/Levy customers which established a consistent pattern of fraudulent sales solicitations involving Levy and the "introducing" or initial AP on the account, testimony which the court found to be credible, consistent and trustworthy.[6]

As to these witnesses, the court makes the following additional findings:

a.  *Scott Anderson*

In March 2004, Mr. Anderson was solicited by Tony Bobba, another AP at UIG, to trade commodities options. Bobba told Mr. Anderson that the war in Iraq and the summer driving season would cause the value of unleaded gasoline calls to increase substantially and that if Mr. Anderson would purchase these call options, he would profit nicely. On March 29, 2004, shortly after Mr. Anderson purchased unleaded gasoline call options through UIG, Bobba told Mr. Anderson that he wanted Levy, a "commodities guru," to call Mr. Anderson and teach him about commodities.

Bobba told Mr. Anderson that Levy lives in an exclusive neighborhood, drives a different expensive car each day of the week, and that, someday—if he is good enough—Bobba hoped to be like Levy. Bobba further told Mr. Anderson that Levy could obtain Euro currency options at a discounted price because he buys so many. In addition, Bobba said that Levy had deep ties to the European financial market, and, in fact, Levy has a picture of he and George Soros on his desk.

The next day, Levy called Mr. Anderson and engaged in a high-pressure sales solicitation regarding Euro currency options. Levy echoed Bobba's assertion that Levy had significant ties to the European financial community and that Levy was an expert in Euro currency options. Levy said that because of the upcoming 2004 presidential election, trade wars, and "wars," he believed now was a good time for Mr. Anderson to purchase Euro currency options. Levy guaranteed Mr. Anderson that he would triple his investment no matter which way the market moved because of Levy's strategy of placing put options and call options around the existing currency value. Levy further told Mr. Anderson that he "may sound like an ass right now, but [Mr. Anderson] will thank [Levy] after all of the money [Mr. Anderson] made." Levy told Mr. Anderson that there was no risk and that he could not lose money.

Based on these representations, Mr. Anderson, who had no knowledge of the Euro currency market, invested another approximately $22,000 through UIG in a series of investments through March and April 2004. Of the more than $27,000 Mr. Anderson invested through UIG, he received only approximately $1,000 back. Mr. Anderson relied on the representations of Levy and Bobba in making these investments with UIG. Mr. Anderson was never told that all Levy's customers realized a loss when they closed their accounts.

b.  *Carrie Allsopp*

In September 2003, Duane Haughton, another AP with UIG, solicited Ms. All-

---

**6.** The experience of the Levy customers was mirrored by the testimony of the other UIG customers testifying about their experiences with other UIG APs, as discussed *infra*.

sopp to trade heating oil options. Haughton said it would be a good investment because of the war in Iraq and the approach of winter. Haughton told Ms. Allsopp that she would profit $4020 per option for every penny increase in a barrel of oil. He also told her that there was no risk because she would make money whichever way the heating oil market moved. On January 29, 2004, Ms. Allsopp invested $10,000 in heating oil options through UIG.

That same day, Haughton told Allsopp that Levy would like to speak with her. Haughton described Levy as a senior, experienced officer of UIG who had done very well for his clients at UIG. In her later conversation with Levy of that same day, Levy told her that because of the upcoming 2004 presidential election and the war in Iraq, the U.S. dollar would be dropping, and, as such, he believed now was a good time for Ms. Allsopp to purchase Euro currency options. Levy said that she could expect the same $4020 per option increase per every cent increase in the Euro. Levy requested that Ms. Allsopp invest $40,000 in Euro currency options through UIG.

Ms. Allsopp told Levy that she held this amount of money from a settlement of an accident that led to the death of her daughter, that the money belonged to her two other children, and that her only job was to make the money grow. Levy said that it would be hard for Ms. Allsopp to take care of her two children on this amount of money; that he could help make sure that her children had what they needed, and that they would know, in the end, that it was their sister who provided it for them. By purchasing call and put options and using stop losses, Levy further assured Ms. Allsopp that the risks, if any, were minimal, and that she should expect to make money on her Euro options investment no matter what happened to the value of the Euro. In fact, he told Ms. Allsopp that she should expect to receive her $40,000 investment back by the end of the week and that he expected to grow the investment to $300,000.

Per Levy's recommendation, Ms. Allsopp invested $40,000 in Euro currency options through UIG. When later informed of a debit balance in her account, Levy told her that she needed to send in additional funds. Further, when she was told that her investment was not performing well and that she should send in additional funds, she asked Levy to place the puts closer to the call price, but he refused. Ms. Allsopp, who has a ninth grade education, relied on Levy's supposed expertise and believed that he cared about doing what was best for her and her children. Ms. Allsopp invested approximately $57,000 through UIG and received back approximately $43. Ms. Allsopp was never told that all Levy's customers realized a loss when they closed their accounts.

### c. *David Cuthbertson*

In February 2004, Sipes, an AP with UIG, solicited Mr. Cuthbertson to trade heating oil options. Sipes said it would be a good investment because of political unrest in Nigeria and Venezuela, the demand on heating oil in the current heating season, the war in Iraq, and the activities of OPEC. Sipes told Cuthbertson he could expect to double or triple his investment in a very short period of time—a matter of two to three weeks. Sipes also told him that, although there was some risk, Mr. Cuthbertson should not worry about it, because it was rare for a UIG customer to lose money. In fact, Sipes said that UIG's customers enjoyed a near perfect success rate, explaining that UIG's strategies of purchasing both calls and puts allowed UIG customers to make money no matter which way the heating oil futures market

moved. Sipes ultimately convinced Mr. Cuthbertson to invest $5000 in heating oil options through UIG.

Shortly thereafter, Sipes told Mr. Cuthbertson of another investment opportunity, this time in Euro currency options. Sipes said that there was an individual at UIG who was higher up in the company who was an expert in Euro currency options and that this individual could assist Mr. Cuthbertson greatly in realizing a very rapid increase in his investment. Sipes then turned Mr. Cuthbertson over to Levy. Levy reiterated to Mr. Cuthbertson that Levy was higher up at UIG than Sipes, that he had considerable experience trading commodity options, and that he was a specialist in trading currency options. Levy also said that his customers were successful and that very few of them lost any money.

Levy said that it was an excellent opportunity to make a great deal of money in a short period of time in the Euro options market. In fact, Levy told Mr. Cuthbertson that he would be able to increase his initial investment three or four times within a matter of ten days. Mr. Cuthbertson agreed to invest $5000, and Levy told him this investment would be worth as much as $21,000 within ten days to two weeks. Levy said there was some risk, but that his track record would mirror the "near perfect" gain record of UIG. He assured Mr. Cuthbertson that any risk was greatly minimized by his particular investment strategy, which involved purchasing both put options and call options to play either direction the Euro market flowed.

Although Levy even promised Mr. Cuthberbertson he would lose no money, Mr. Cuthbertson ended up investing $13,650 through UIG and receiving back approximately $1000 when he closed his account. Mr. Cuthbertson relied on the representations of Levy and Sipes in making his decision to invest through UIG, and was never told that all Levy's customers realized a loss when they closed their accounts.

### d. *Charles Jeffrey Thompson*

Mr. Thompson was first solicited by Vince Monti, an AP at UIG, to trade commodity options. Monti told Mr. Thompson that he could make a lot of money investing in unleaded gasoline options because of the upcoming summer vacation season and the ongoing war. Monti told Mr. Thompson he could make $100,000.00 off a $10,000.00 investment, and that with the research of UIG, there was "virtually no risk."

Following his initial $5000.00 investment, Monti called him almost daily to report gains in the market, assuring him that his investment had already doubled. About a week later, he called Mr. Thompson to tell him that UIG's bigger brokers—including Jay Levy—were conducting a huge closed door meeting and that he would call Mr. Thompson back when he had more information. Monti phoned Mr. Thompson about one to two hours later and told Mr. Thompson that there was "something really huge going on in the market" and that he had the unusual opportunity to speak with Levy, who usually only handled large institutional customers.

Levy phoned Mr. Thompson about one hour later. Levy described himself to Mr. Thompson as a self-made millionaire who was well known in the commodities industry for making people a lot of money. In a high-pressure sales pitch regarding Euro currency options, Levy explained to Mr. Thompson that something big was happening in the Euro currency market and that the Euro was worth more than the U.S. dollar. Levy told Mr. Thompson that such a movement had happened only once before in the Euro currency market and that Levy had made a lot of money at that

time. Levy asked Mr. Thompson if he wanted to "be rich" like Levy, and said Mr. Thompson could make "hundreds of thousands of dollars" and even become a millionaire in the Euro market. Levy advised Mr. Thompson that his research and market information allowed him to take the risk out of the Euro currency options and virtually guarantee the investment. Relying on the representations make by Levy and Monti, Mr. Thompson invested $57,750 in options (including $52,000 in Euro options) through UIG. Mr. Thompson was never told that all Levy's customers realized a loss when they closed their accounts and that UIG had an overall failure rate of 95%. Mr. Thompson lost all but $23,000 of his investment when he finally pulled his account.

### e. *Sergeant Lanzy Williams*

In November of 2003, UIG AP Greg Atz solicited Sgt. Lanzy Williams, a command sergeant major in the U.S. Army, to trade heating oil options. Atz told Sgt. Williams that heating oil options were a lucrative investment due to pipeline sabotage in Iraq and the upcoming winter in the Northeast. Atz essentially guaranteed Sgt. Williams—who was then in the midst of training soldiers to go to Iraq to defend the pipelines—that it was "almost guaranteed" his investment would triple or quadruple in about thirty to forty days if he invested in the market immediately. Shortly after Sgt. Williams made his initial $5000.00 investment and was continually assured by Atz that his investment was doing very well, Atz suggested that Sgt. Williams meet his boss, Jay Levy. Atz described Levy as a very busy man who could show Sgt. Williams how to make a lot of money.

Atz then handed off Sgt. Williams to Levy, who initiated a high-pressure sales solicitation regarding Euro currency options. Levy explained to Sgt. Williams that the Euro was outperforming the U.S.

dollar because it was stronger and that Sgt. Williams could quadruple his investment in thirty to sixty days. He told him timing was critical, and that he could guarantee he would make a profit. Levy did not discuss any risks associated with Euro currency options, and was on notice that Sgt. Williams was looking for a stable investment. In fact, Sgt. Williams wrote on the UFHC paperwork, which Levy reviewed, that his plan or goal for the account was "long-term financial security." (Defendants' Exhibit 30; Plaintiff's Exhibit 36) Because Sgt. Williams did not have additional cash on hand, Levy advised him to withdraw money from his 401(k) plan which was "just sitting there and not doing anything" in order to fund an investment in Euro currency options. Levy assured Sgt. Williams that the profits on his investment would more than make up for the twenty percent tax penalty associated with the early 401(k) withdrawal.

Relying on the representations made by Levy, Sgt. Williams invested approximately $17,000 in Euro currency options. He eventually lost his entire investment, more than $22,000.00. Sgt. Williams was never told that all Levy's customers realized a loss when they closed their accounts.

### f. UIG Customer Experiences with Other UIG APs

#### (I) Terry Landt

Terry Landt of Marshaltown, Iowa was solicited in February 2004 by UIG AP Tony Bobba to trade unleaded gas options. Bobba told her she would make $420 per option for every penny that the price went up, that unleaded gas would escalate due to the upcoming summer driving season and war in Iraq. Mrs. Landt relayed to Bobba that she earned $25,000 per annum working in residential services for mentally handicapped persons, while her husband earned $35,000–$40,000 a year. She also

told Bobba about her difficult childhood—her father was an alcoholic who spent all his money on beer and abused her—and her desire to provide a better life for her own two children, a son with partial clubbed feet and learning disabilities, and a daughter with severely clubbed feet who required multiple surgeries and casts for two years.

After taking her initial $3000 investment, Bobba handed her off to his "mentor," Greg Alotta, who [ like the "talk up" about Levy] allegedly drove a different, new car to work every day of the week and had over 25 years of trading experience. Alotta then contacted Mrs. Landt, who told him she wanted to continue to work with Bobba. She said she found Alotta difficult to understand because "he talked so fast. .half the time I didn't understand what [he was] saying." This request was ignored, with Alotta keeping up the sales pressure, telling Mrs. Landt he wanted to make her into a millionaire. She told him this would be "great" because she "could use the money." Alotta managed to solicit another $5000 from Mrs. Landt before the markets reportedly "went bad" and she lost her entire investment, save $191.98.

### (ii) John Manders

John Manders is a retired high school teacher from Grand Rapids, Michigan who works part time scoring basic skills tests. He was solicited by Vince Monte in March of 2004 to trade gasoline options. Like the other UIG customers, he was told that gas prices would be going up due to summertime driving and the war in Iraq. After soliciting his initial $5000 investment, and suggesting that Manders lost an opportunity to make $21,000 on it when the price was up as a result of missing Monte's phone call when Manders was preoccupied during a testing procedure, Monte handed Mr. Manders off to Greg Alotta.

In making the pass off, Monte used similar "talk up" techniques as those employed by Levy's introducing brokers, characterizing Alotta as "the guru" who usually only handled institutional clients. Alotta later convinced Mr. Manders to invest another $10,000, assuring him he "could not lose" with his methodology for placing puts and calls and stop losses.

### f. Audiotape Conversation with UIG Customer "Jerry"

The pattern of sales solicitations established by the Levy customers described above is further shored up by an audiotape recording of an actual sales solicitation demonstrating Levy's use of improper, high-pressure sales tactics in an attempt to persuade a UIG investor ("Jerry") to purchase commodities options. (Plaintiff Exhibit 44) On this tape, Levy tells Jerry that by purchasing commodities options, he would make a tremendous amount of money in a relatively short period of time, and that with Levy's "perfect" plan of purchasing both calls and puts, Jerry would make money whichever way the market moved.

Levy claimed there was little, if any, risk; that the investment was "really conservative," and, that although he might may think Levy a "pain" now, Jerry would later thank Levy after he makes his money. (Plaintiff's Exhibit 44) When Jerry expressed hesitance at investing, Levy asked him whether Shapiro (another AP at UIG) had told Jerry about him. Jerry responded by acknowledging that he knew Levy's time was valuable.

In his trial testimony, Levy acknowledged that the audiotape displayed improper sales tactics similar to those alleged by the customers testifying against him in this case.

### g. Sales Scripts

The pattern of Levy customer testimony is also echoed by the contents of a document entitled, "Sales Success: The Complete Guide to Selling Investments Around the World" which was retrieved from Levy's UIG office. (Plaintiff's Exhibit 31). This manual includes numerous scripts for sales solicitations, including several that are remarkably similar to the techniques which the testifying customers in this case described as part of their experience with Levy.

For example, this document at page 8 recites the following exemplar pitch:

"_____, my company has targeted an investment that we believe could double or triple your money in the next 30 to 60 days."

(Plaintiff Exhibit 31, 500 16900) This is very similar to the plug used by Levy on Mr. Anderson, Mr. Cuthbertson, and Sgt. Williams. Levy himself admitted that it is possible he told UIG customers that they could double or triple their investment in 30 to 60 days.

Further, at Chapter 5, captioned "Working with Other Brokers," the following exemplar pitch appears:

Introducing the second broker: Listen, _____, the president of the company is taking everyone off the phones in a few minutes. The top broker here is giving an emergency meeting on the markets. This doesn't happen often but when it does it's usually something big.

(Plaintiff Exhibit 31, 500 16954). The script continues and instructs the first broker to call the customer when the senior broker is available; The first broker is then to tell the customer that the senior broker has agreed to speak with the customer as a favor. The "important meeting" pitch and "talking up" of senior brokers allegedly preoccupied with handling institutional customers, with the suggestion that the opportunity to speak with them is a rare favor is very similar to what the testifying customers described in their experience with Levy in this case.

### h. Omissions on Abysmal Performance Record

Levy had approximately 75 customers at UIG. (Plaintiff's Exhibit 15) Of these customers, 100 percent realized losses when they closed their account. Levy admitted that he knew that all or close to all of his customers lost money in their accounts[7], yet he never told a single customer of his abysmal investment record.

At the same time, Levy admitted that he could see why customers would want to know his track record; that information regarding his track record would have been helpful to a reasonable investor prior to investing; and that if Levy was seeking investment advice from a person, he would want to know if that person had a 100 percent failure rate.

During his tenure at UIG, Levy generated $416,691.30 in salary and commissions on trades. At the same time, his customers suffered combined losses of $2,602,216.46. (Plaintiff's Exhibit 10). None of his customers made money[8], and at least six UIG customers (including testifying customer Scott Anderson) filed reparations actions against him for improper sales solicitations.

---

7. Levy stated he used daily equity runs and Future Source each day to determine exactly how each of his customers was doing. (Plaintiff's Exhibit 33)

8. Lacy Dingman, the CFTC forensic investigator who analyzed the trades and commissions at UIG testified that 95% of UIG's 498 customers lost money between August 2003 and November 2004, with a net customer loss of $8,025.020.64. (Plaintiff Exhibit 15)

## II. CONCLUSIONS OF LAW

■ The CFTC must prove three elements to establish liability for solicitation fraud: (1) the making of a misrepresentation, misleading statement or deceptive omission; (2) scienter; and (3) materiality. *Commodity Futures Trading Commission v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir.2002). These three requirements are satisfied here.

### 1. Levy Made Misrepresentations, Misleading Statements, and Deceptive Omissions Regarding Profit Potential and Risks of Trading Options

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding' of the information conveyed." *R.J. Fitzgerald* at 1328. Statements overemphasizing profit potential while downplaying risk have been found actionable, as have statements "linking profit expectations on commodities options to known and expected weather events, seasonal trends, and historical highs," or intimations "that the commodities market can be correctly timed to generate large profits." *Id* at 1330.

In *R.J. Fitzgerald*, for example, the Eleventh Circuit found it deceptive and misleading to tell customers they could expect "huge profits" of "200 to 300%" based on continuation of El Nino weather patterns, while simultaneously advising that the customers needed to act "now" because there may "never" be such an opportunity in the market. *Id.* at 1329–1330.

In this case, Levy made misrepresentations and misleading statements that similarly exaggerated profit potential and downplayed risk. He repeatedly promised customers that they would at least double or triple their investments in less than a few months, even though historically 100 percent of Levy's customers lost some or all of the money they used to purchase options through him.

Levy also misled his clients by suggesting that the then upcoming 2004 U.S. presidential election and the war in Iraq, as well as other well-known public information, would translate into predictable market movements yielding enormous profits with little or no risk. These statements were misleading and fraudulent because well known public information is already factored into the price of the underlying commodity in well-developed markets. *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (finding that well-developed markets reflect all publicly available information); *CFTC v. Chase Commodities*, 2006 WL 321965 (C.D.Cal.2006).

Levy further misled his customers by urging them to begin trading immediately or miss the opportunity to make maximum profits. According to Levy, this so-called opportunity came only once in a lifetime. This high-pressure sales tactic falsely conveyed the impression that profits were guaranteed and that the only variable was the timing (immediate) of the investment. *See R.J. Fitzgerald*, 310 F.3d at 1329.

Levy also deceived his customers by simultaneously downplaying the potential risks of trading options. He assured his customers that the risk of loss was minimal, if not nonexistent, because his trading strategies made money for customers whether the market moved up or down and because stop-loss orders largely limited any customer losses. While making these wildly unrealistic statements regarding profit potential, Levy never told his customers about his 100% losing track record at UIG.

■ Levy argues that his optimistic descriptions of profit potential were offset by the client's signature of boilerplate risk disclosure forms prescribed by the Com-

mission. However, general risk disclosure statements do not negate the effect of clearly misleading and deceptive statements where the overall message is clearly and objectively misleading or deceptive. *R.J. Fitzgerald*, 310 F.3d at 1329. *CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999); *Clayton Brokerage Co. v. CFTC*, 794 F.2d 573, 580 (11th Cir.1986) (per curiam) Here, Levy's reckless misconduct nullified any standard disclosures that his customers may have signed acknowledging the risk of commodity options trading. The court finds that Levy made deceptive and misleading statements in the solicitation of his customers.

### 2. *Levy Acted with Scienter*

■ In order to establish solicitation fraud in violation of the Act and Regulations, the Commission must also demonstrate that Levy acted with scienter. A showing of intentional conduct or extreme departure from the standard of ordinary care is sufficient to satisfy the scienter requirement. In general, the requirement of scienter is satisfied with proof of "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [ customers] which is either known to the defendant, or so obvious that defendant must have been aware of it." *See e.g. R.J. Fitzgerald*, 310 F.3d at 1328, *quoting Ziemba v. Cascade Int'l Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001); *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir.1995).

■ In this case, it was utterly unreasonable for Levy to present himself as a "top broker" or "commodities guru," or to suggest that the customers' risk of loss was minimal in light of his known 100% losing trading record at UIG. It was also utterly unreasonable for Levy to suggest that well known international and seasonal events would lead to guaranteed profits for his customers, where none of his customers had profited from this type of well-

known information in the past. Levy's misrepresentations about his own and his firm's alleged "near perfect" success record are so outrageous that he must have known they were misleading his customers, or at the very least, this danger was so obvious his awareness of it is presumed as a matter of law.

The court concludes that Levy made the misrepresentations and omissions in question with the requisite scienter.

### 3. *Levy's Misrepresentations and Omissions Were Material*

A statement or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment. *R.J. Fitzgerald*, 310 F.3d at 1328–29, *citing Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *R&W Technical Services, Ltd.* v. CFTC, 205 F.3d 165 (5th Cir.2000).

■ In this case, Levy's misrepresentations and omissions concerning his trading record, the potential for huge profits and his own level of trading experience created the false impression that he had vast expertise in commodities trading, that profits were guaranteed and that the only risk variable was whether the customer was willing to act quickly enough to make the trade. These omissions and misrepresentations are material because a reasonable investor would have considered them important when making an investment decision, and would have relied on these suggestions in determining whether to invest in the commodities market, and in particular, with Levy and UIG. *CFTC v. Next Financial Serv. Unlimited*, 2006 WL 889421 (S.D.Fla. March 30, 2006).

## III. REMEDIES

### A. Asset Freeze

■ The Commission asks the Court to continue the asset freeze put into place at

the outset of this litigation pending satisfaction of any equitable restitution award rendered in this case. The Court finds sufficient evidentiary basis for this relief.

A request for equitable relief invokes the court's inherent powers to order an asset freeze as preliminary relief to assure the availability of the permanent remedy sought. In this case, the Commission's complaint seeks, *inter alia,* the equitable remedies of restitution and disgorgement.

Because the court has found a sufficient evidentiary basis to impose liability and order equitable restitution, and because it finds a clear nexus exists between the frozen funds and Levy's fraudulent trading activity,[9] it concludes that the freeze of assets attributable to Levy should remain in effect pending satisfaction of the restitution and civil monetary penalties imposed against him in this case. *United States v. Oncology Associates et al.,* 198 F.3d 489 (4th Cir.1999); *Reebok International Ltd. v. Marnatech Enterprises,* 970 F.2d 552 (9th Cir.1992).

## B. RESTITUTION

■ The Court has authority to order restitution as "ancillary equitable relief." *CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573 (9th Cir.1982). *FTC v. U.S. Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984); *AT&T Broadband v. Tech Communications, Inc.,* 381 F.3d 1309 (11th Cir.2004).

■ In this case, the CFTC seeks restitution to compensate *all* customers defrauded by Levy, even those who did not testify, for a total restitution amount of $2,602,216.46, together with prejudgment and post judgment interest. Levy objects that the Commission has only presented the testimony of five investors who dealt with Levy, and that the Court cannot presume, based on those individualized accounts, that all UIG customers dealing with Levy lost their money due to fraudulent solicitations.

The court agrees that this is not a case where the court should presume reliance by all of Levy's customers on theory that a pattern of fraudulent omission was widespread. While the customer testimony did establish certain reoccurring fraudulent solicitation tactics on Levy's part, the evidence was not sufficient to infer that Levy's wrongdoing was so systematic and pervasive that every customer he dealt with was harmed by fraudulent solicitation. *See Cf. Waters v. Int'l Precious Metals Corp.,* 172 F.R.D. 479 (S.D.Fla.1996). Accordingly, restitution shall be limited to the five customers who testified at trial in the following amounts, representing the total losses attributable to each as a consequence of Levy's misconduct (Plaintiff's Exhibit 8):

(1) Mr. Anderson—$18,160.14 [10]

(2) Ms. Allsopp—$59,610.78;

(3) Mr. Cuthbertson—$12,061.98;

(4) Mr. Thompson—$33,953.70; and

(5) Sgt. Williams—$22,564.28.

The court accordingly finds Levy liable for restitution to the testifying customers in the total amount of $146,350.88, plus pre-judgment interest on the restitution awards to be paid at the then prevailing underpayment rate established by the In-

9. The evidence showed that customers defrauded by Levy sent money to UFHC to purchase options and pay commission and fees. UFHC remitted the commissions to UIG who, in turn, paid Levy commissions on those payments. Levy then deposited these funds into bank accounts controlled by him, and those accounts are now frozen pursuant to the preliminary asset freeze ordered by this court.

10. This sum reflects an offset of $9000 paid to Mr. Anderson in settlement of his reparations claim.

ternal Revenue Service pursuant to 26 U.S.C. § 6621. Post-judgment interest shall then accrue on the total restitution judgment from the date of this order until it is paid in full at the Treasury Bill rate prevailing on the date of this order pursuant to 28 U.S.C. § 1961(a).

## C. DISGORGEMENT

■ The Commission also seeks disgorgement of all ill gotten gains/profits generated by Levy's fraudulent solicitations. As with restitution, it seeks to compute the value of this loss unit on the basis of *all* Levy's UIG sales, including those of non-testifying customers, for a total disgorgement value of $416,691.30.

While the profits obtained on the trades of the testifying customers is certainly an appropriate subject for disgorgement, it is unnecessary to order disgorgement of these sums because the restitution order has already redressed this loss, and that equitable remedy, together with the civil monetary penalties assessed below, is sufficient to prevent the defendant from profiting from his fraud upon the testifying customers.

The court is unable to order disgorgement of the balance of other profits earned by Levy at UIG because it does not make a specific finding, on this record, that all of Levy's solicitations at UIG were unlawful under the Act.

## D. CIVIL PENALTIES

■ Section 6c of the Act together with CFTC Regulation 143.8(2)(ii), 17 C.F.R. § 143.8(2)(ii), permits imposition of a civil monetary penalty (CMP) of up to the greater of $120,000 per violation or triple the monetary gain to the violator.[11] 17 C.F.R. 143.8(a)(1)(ii).[12] In this case, the Commission's complaint alleges that each material misrepresentation and omission of Levy is a separate violation of law. [See Complaint, ¶ 47]. At trial, it proved that Levy committed at least five of the six violations alleged in its Complaint[13] with respect to each of the five testifying customers. Therefore, the civil monetary penalty against Levy could potentially be as high as $600,000 [$120,000 × 5] per testifying customer, for a maximum total CMP of $3,000,000. *See Slusser v. CFTC*, 210 F.3d 783, 786 ("[T]he penalty in an

11. As authorized by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101–410; 104 Stat. 890, the Commission raised the penalty per violation from $100,000 to $120,000 for each act committed on or after October 23, 2000. 17 C.F.R. 143.8(2)(ii).

12. Section 143.8(a)(1)(ii) provides:
143.8 Inflation adjusted civil monetary penalties
(a) Unless otherwise amended by an act of Congress, the inflation adjusted maximum civil monetary penalty for each violation of the Commodity Exchange Act or the rules or orders promulgated thereunder that may be assessed or enforced by the Commission under the Commodity Exchange Act pursuant to an administrative proceeding or a civil action in Federal court will be:
(1) For each violation for which a civil monetary penalty is assessed against any

person (other than a registered entity) pursuant to Section 6(c) of the Commodity Exchange Act, 7 U.S.C. § 9:

. . . . .

(ii) For violations committed between October 23, 2000 and October 22, 2004, not more than the greater of $120,000 or triple the monetary gain to such person for each such violation . . .

13. The violations proved for each testifying customer included misrepresentation regarding likelihood and amount of profit potential; misrepresentation regarding impact of seasonal trends and well known public information; misrepresentation regarding impact of timing of investment; omission regarding risk of loss associated with options trading; omission regarding losing performance record of UIG and Levy.

administrative [CFTC] prosecution is limited by the number of violations alleged in the complaint times the maximum fine per violation.").

The CFTC has stated:

Civil monetary penalties serve a number of purposes. These penalties signify the importance of particular provisions of the Act and the [CFTC]'s rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed the violations intentionally. Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost. To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct.

*CFTC v. Emerald Worldwide Holdings, Inc.*, 2005 WL 1130588 *11 (C.D.Cal.2005), citing *In re GNP Commodities, Inc.* [1990–1992 Transfer Binder] Com. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC 1992) (citations omitted).

Recognizing the gravity of the offenses, the brazen and intentional nature of the violations, the vulnerability of the victims, Levy's long history of flouting the authority of the Commission and his apparent unwillingness to reform his conduct, together with his remarkable lack of accountability or remorse for the transgressions established against him in this case, the court has determined that imposition of a substantial and meaningful CMP is justified.

Rather than unbundle the violations alleged with respect to each of the testifying customers, the court has determined to treat Levy's dealings with each of the testifying customers as a single violation of the Act, and consequently determines $120,000 CMP to be a reasonable penalty assessment for each of the testifying customers.[14]

Accordingly, Levy shall be assessed a total civil monetary penalty in the amount of $600,000.00 [$120,000 × 5].

### E. INJUNCTIVE RELIEF

The CFTC seeks entry of a permanent injunction prohibiting Levy from future violations of the CEA and barring him from engaging in any commodity related activity.

■■■ The court finds the requested injunctive relief to be appropriate in this case because liability is overwhelmingly established, and there is a reasonable likelihood that the wrong will be repeated in light of Levy's history of illegal conduct and his persistent denial of any wrongdoing in the matter at hand. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982); *CFTC v. Investors Freedom Club, Inc.*, 2005 WL 940897 (M.D.Fla.2005). See also *CFTC v. Rosenberg*, 85 F.Supp.2d 424, 454 (D.N.J.2000); *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F.Supp. 669, 676–77 (S.D.N.Y.1979).

14. The CFTC urges the court to compute the CMP based on three times the amount of total profits generated by Levy on *all* of his UIG clients ($416,691.30), resulting in a CMP of $1,250,073.90. However, the court has not made a specific finding that Levy violated the Act in the solicitations of all of his customers; Therefore, the correct starting point for calculation of monetary gain looks to the profit he captured on sales solicited from each of the testifying customers only. Since the total loss suffered by each individual testifying customer was in all cases less than $120,000, the monetary gain to Levy from each individual testifying customer is necessarily a sum less than $120,000. Because it is not made to appear that his monetary gain from any individual customer exceeded $40,000, the court finds that the maximum CMP authorized by statute in this case is $120,000.00 for each violation established.

Even in his post trial briefing, Levy continues to eschew responsibility for his actions and insists that his sales tactics at UIG were legitimate. Given his violation track record, the pattern of brazen violations established during his tenure at UIG, and his continued protestations of no wrongdoing, the court finds it highly likely that Levy will continue to engage in similar improper schemes related to solicitation of new customers in future commodity related activity unless he is restricted in a meaningful way.

Finding sufficient evidence to warrant a permanent injunction against Levy in order to prevent further illegal activity and additional injury to the public, it is

**ORDERED and ADJUDGED:**

1. Defendant Levy, his agents, servants, employees, successors and assigns, are permanently enjoined from engaging in any activity that violates Section 4c(b) of the CEA, 7 U.S.C. 6c(b), and 17 C.F.R. 33.10 by directly or indirectly cheating or defrauding, or attempting to cheat or defraud any other person by any means whatsoever in connection with an offer to enter into, the entry into, the confirmation of, or the maintenance of any commodity option transaction.

2. Defendant Levy, his agents, servants, employees, successors and assigns are permanently enjoined, restrained from and prohibited from, directly or indirectly, any commodity related activity, including:

a. soliciting, receiving or accepting any funds in connection with the purchase or sale of any commodity futures contract or option on a futures contract, including the solicitation of new customers or funds;

b. engaging in, controlling or directing the trading for any commodity interest account (including commodity futures, security futures, options or futures, foreign currency accounts) for or on behalf of any other person or entity, either directly or indirectly, whether by power of attorney or otherwise.

c. applying for registration or seeking exemption from registration with the Commission in any capacity, or engaging in any activity requiring registration or exemption from registration, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), and acting, directly or indirectly, as a principal, officer, director, supervisor, agent or employee of any person registered, required to be registered or exempted from registration, unless such exemption is pursuant to Commission Regulation 4.14(a)(9). This includes, but is not limited to, soliciting, accepting or receiving any funds, revenue or other property from any person, giving commodity trading advice for compensation or soliciting prospective customers related to the purchase or sale of any commodity futures, security futures, options, options on futures, or foreign currency futures, except as provided for in Commission Regulation 4.14(a)(9).

d. filing a petition in bankruptcy without providing the Commission with prompt notice by Certified Mail of such filing.

**DECRIAL PROVISIONS**

In light of the foregoing, it is **ORDERED and ADJUDGED:**

1. Defendant's motion to exclude, or alternatively to strike, plaintiff's restitution claim [DE# 110] is **DENIED.**

2. The **INJUNCTIVE RELIEF** requested in plaintiff's complaint is **GRANTED** as outlined above.

3. The CFTC is awarded a judgment of **RESTITUTION** ("Restitution Obligation") against defendant Jay Levy in the total amount of $146,350.88, plus pre-judgment interest to be paid through the date of this order at the prevailing underpayment rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621, plus

post—judgment interest to be paid on the resulting total Restitution Obligation from the date of this order until it is paid in full at the Treasury Bill rate prevailing on the date of this order pursuant to 28 U.S.C. § 1961(a).

4. The CFTC is awarded a **CIVIL MONETARY PENALTY** (CMP) of $600,000.00. ("CMP Obligation"). Levy shall pay post judgment interest on the civil monetary penalty amount from the date of this Order until the civil monetary penalty amount is paid in full, at the rate provided in 28 U.S.C. § 1961.

Payment of the civil monetary penalty shall be made to the Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street, N.W. Washington D.C. 20581. Payment must be made by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order made payable to the Commodity Futures Trading Commission. The payment(s) shall include a cover letter that identifies Levy and the name and docket of this proceeding. Levy shall simultaneously transmit a copy of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21 St., N.W. Washington D.C. 20581.

5. Defendant Levy shall not transfer or cause others to transfer funds or other property to the custody, possession or control of any other person for the purpose of concealing such funds or property from the Court, the CFTC or any officer that may be appointed by the Court to monitor the payment of his Restitution Obligation or his CMP Obligation.

6. This Court shall retain jurisdiction of this case to assure compliance with this Order and for all other purposes related to this action.

### ORDER GRANTING in PART & DENYING in PART DEFENDANT JAY M. LEVY'S MOTION FOR RECONSIDERATION

**THIS CAUSE** is before the court on defendant Jay J. Levy's motion to reconsider, alter or amend the final judgment of injunctive and other relief which entered against him on May 18, 2006. [DE# 165]. Having carefully considered the motion, the court has determined to grant the motion to the limited extent that the post judgment asset freeze shall be clarified and modified to exclude future earnings and after acquired assets from its operation, while otherwise denying the motion in all respects.

It is accordingly **ORDERED and ADJUDGED**:

1. The defendant Jay M. Levy's motion to reconsider, alter or amend final judgment filed June 2, 2006 [DE# 165] is **GRANTED** to the limited extent that the post judgment asset freeze imposed by the final judgment entered May 18, 2006 is now clarified and amended so that future earnings and after acquired assets of the defendant Levy shall be excluded from its operation.

2. The defendant Jay M. Levy's motion to reconsider, alter or amend final judgment filed June 2, 2006 [DE# 165] is otherwise **DENIED** in all respects.